IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-76

Filed: 16 July 2019

Orange County, No. 17 CVS 1399

CHERYL LLOYD HUMPHREY LAND INVESTMENT COMPANY, LLC, Plaintiff,

v.

RESCO PRODUCTS, INC. and PIEDMONT MINERALS COMPANY, INC., Defendants.

Appeal by Plaintiff from order entered 1 October 2018 by Judge Michael J. O'Foghludha in Orange County Superior Court. Heard in the Court of Appeals 22 May 2019.

*Manning Fulton & Skinner, P.A., by Charles L. Steel, IV, and J. Whitfield Gibson, for the Plaintiff-Appellant.*

*McGuireWoods LLP, by Abbey M. Krysak, for the Defendants-Appellees.*

BROOK, Judge.

Plaintiff appeals the dismissal of its complaint by the trial court. Because the trial court dismissed Plaintiff's complaint under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, our recitation of the facts is based on the allegations in Plaintiff's complaint.

I. Background

A. Factual Background

Plaintiff Cheryl Lloyd Humphrey Land Investment Company, LLC ("Plaintiff") is a limited liability company that owns real estate in Orange County, North Carolina. In the summer of 2013, Plaintiff entered negotiations with Braddock Park Homes, Inc. ("Braddock Park Homes") to sell Braddock Park Homes approximately 45 acres of real property located on Orange Grove and Enoe Mountain Road in Hillsborough, North Carolina. Braddock Park Homes planned to develop a 118 unit townhome subdivision similar in style to the existing Braddock Park townhome development located in Hillsborough. However, the proposed development could not be completed as planned unless the Town of Hillsborough ("the Town") agreed to annex the property and make certain zoning changes.

A series of meetings took place in the fall of 2013 in which the Town and its planning board considered whether to annex and re-zone the property as proposed. Defendants Resco Products, Inc. and Piedmont Minerals Company, Inc. ("Defendants"), owners of real property adjacent to the proposed development, participated in these meetings, opposing approval of the project by the Town. During the course of these proceedings, Defendants made various representations to the Town and its planning board regarding the dangers posed by fly rock, air blasts, and ground vibrations resulting from their operations of a mine on land adjacent to the proposed townhome development and, specifically, blasting conducted at the mine. Despite Defendants' opposition to the project, however, the meetings before the Town

and its planning board culminated in the Town approving Braddock Park Homes's request that the property be annexed by the Town, and making the required zoning changes.

After securing approval of the project from the Town, Plaintiff entered into a Purchase and Sale Agreement ("the Agreement") with Braddock Park Homes, the negotiation of which had been ongoing throughout the time of the proceedings before the Town and its planning board in fall of 2013 and early 2014. Defendants were aware of these negotiations.

The Agreement Plaintiff entered into with Braddock Park Homes contemplated two development phases. In Phase I, Braddock Park Homes agreed to purchase approximately 41 acres of real estate from Plaintiff for $85,000 per acre. In Phase II, Braddock Park Homes was granted a "free look" for a specified period of time to purchase an additional 5.5 acres, which was directly adjacent to land owned by Defendants, near the location of their mining operation. Under the Agreement, Braddock Park Homes enjoyed the right to terminate Phase II of the project. Although Phase I was consummated, Braddock Park Homes exercised its right to modify the Agreement on 9 October 2014, terminating Phase II. Braddock Park Homes cited the representations made by Defendants to the Town during the approval process as the reason for terminating Phase II.

B. Procedural History

On 27 October 2017, Plaintiff initiated this action. In its complaint, Plaintiff alleges a single cause of action for tortious interference with prospective economic advantage. Plaintiff's claim for tortious interference with prospective economic advantage is based on representations made by Defendants to the Town and its planning board during the approval process. Plaintiff asserts that these representations were in fact misrepresentations, and that these misrepresentations were made by Defendants maliciously, intentionally, and without justification, proximately resulting in the termination by Braddock Park Homes of Phase II of the Agreement, and injuring Plaintiff in an amount equal to the $85,000 per acre price of Phase I.

In lieu of an answer, Defendants filed a motion to dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. The motion came on for hearing before the Honorable Michael J. O'Foghludha in Orange County Superior Court on 1 October 2018. The trial court granted Defendants' motion in an order entered the same day. Plaintiff entered timely notice of appeal on 29 October 2018.

## II. Analysis

### A. Standard of Review

A motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure "tests the legal sufficiency of the complaint by presenting the question

whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some recognized legal theory." *Cage v. Colonial Bldg. Co., Inc.*, 337 N.C. 682, 683, 448 S.E.2d 115, 116 (1994) (internal marks and citation omitted). A motion to dismiss for failure to state a claim upon which relief can be granted should not be granted unless it "appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970).

Our review of the decision by a trial court to grant a motion to dismiss under Rule 12(b)(6) is *de novo*. *Ventriglia v. Deese*, 194 N.C. App. 344, 347, 669 S.E.2d 817, 819–20 (2008). In determining whether "the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory[,] . . . [we] must construe the complaint liberally[.]" *Hinson v. City of Greensboro*, 232 N.C. App. 204, 208, 753 S.E.2d 822, 826 (2014) (internal marks and citation omitted). We will not affirm the dismissal of a complaint under Rule 12(b)(6) "unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief." *Enoch v. Inman*, 164 N.C. App. 415, 417, 596 S.E.2d 361, 363 (2004) (internal marks and citation omitted).

B. The *Noerr-Pennington* Doctrine

This appeal first presents the question of the applicability of the *Noerr-Pennington* doctrine. Defendants contend that the trial court did not err in concluding that Plaintiffs' complaint fails to state a claim upon which relief can be granted because the allegations in Plaintiffs' complaint are insufficient, as a matter of law, under the *Noerr-Pennington* doctrine. We disagree.

## i. Introduction

We note at the outset that this case is not a dispute between competitors in the marketplace, nor does it arise in a context in which concerns about the consolidation of market power detrimentally impacting consumers animate a statutory or regulatory framework under which any claim at issue in this case arises. In the discussion that follows we summarize the origins of the *Noerr-Pennington* doctrine and its application in North Carolina. We go on to hold that the *Noerr-Pennington* doctrine does not apply to this case. Accordingly, we reject the argument that the complaint fails to state a claim upon which relief can be granted under the *Noerr-Pennington* doctrine.

## ii. The Origins of the *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine originates from the U.S. Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed.2d 464 (1961) ("*Noerr*"), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed.2d 626 (1965) ("*Pennington*"),

which are together its namesake. In *Noerr*, the Supreme Court held that the First Amendment protects businesses when they engage in certain petitioning activities, such as initiating litigation, providing them with immunity from antitrust liability when their conduct is aimed at influencing governmental action and their petitioning activity otherwise potentially violates §§ 1 and 2 of the Sherman Act, which proscribe conspiracies to restrain trade and attempts to impose monopolies, respectively. *See* 365 U.S. at 135-37, 81 S. Ct. at 528-29. *Pennington* then reiterated the core teaching of *Noerr*: that immunity from antitrust liability under the First Amendment exists for "concerted effort[s] to influence public officials regardless of intent or purpose." 381 U.S. at 670, 85 S. Ct. at 1593.

However, the Supreme Court in *Noerr* recognized an exception to this immunity where the conduct at issue is a "mere sham," such as where an anti-competitive publicity campaign, while "ostensibly directed toward influencing governmental action, is . . . actually nothing more than an attempt to interfere directly with the business relationships of a competitor[.]" 365 U.S. at 144, 81 S. Ct. at 533. For example, for the "sham" exception to the doctrine to apply to a lawsuit it "must be objectively baseless and must conceal an attempt to interfere directly with the business relationships of a competitor"; that is, "the plaintiff must have brought baseless claims in an attempt to thwart competition (i.e., in bad faith)." *Octane*

*Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556, 134 S. Ct. 1749, 1757, 188 L. Ed.2d 816 (2014) (internal marks and citation omitted).

iii. The Application of the *Noerr-Pennington* Doctrine in North Carolina

This Court has addressed the applicability of the *Noerr-Pennington* doctrine three times previously. The first was *Reichhold Chemicals, Inc. v. Goel*, 146 N.C. App. 137, 555 S.E.2d 281 (2001). *Reichhold Chemicals* involved the departure of an expert in the field of moisture cured polyurethane adhesives from the employ of the plaintiff, a business competing in the adhesives space, and the subsequent engagement of this expert, the defendant, by a direct competitor of the plaintiff in the adhesives business, who was not a party to the appeal to this Court. *Id.* at 142-43, 555 S.E.2d at 284-85.

We observed in *Reichhold Chemicals* that the Supreme Court's decision in *Noerr* was based "on the First Amendment right to petition and . . . federal antitrust law." *Id.* at 148, 555 S.E.2d at 288. Rejecting the plaintiff's challenge to the sufficiency of the pleading of the defendant's counterclaims based on the *Noerr-Pennington* doctrine, we reasoned that the defendant's counterclaims did not interfere with the plaintiff's First Amendment rights to seek redress from the government for the harms it allegedly suffered as a result of its competitor's conduct. *Id.* The defendant, therefore, was not required to supplement the pleadings in his counterclaim by including allegations that, if proven, would establish that the sham

exception under the *Noerr-Pennington* doctrine applied. *See id.* We instead concluded that the *Noerr-Pennington* doctrine itself did not apply, refusing to accept the argument that the failure to plead through the exception to *Noerr-Pennington* immunity was fatal to the defendant's counter-complaint. *See id.* (observing that "even if plaintiff's suit against [its competitor] was objectively reasonable, plaintiff could still be liable for tortious interference" to the defendant).

We addressed the *Noerr-Pennington* doctrine for a second time in *Good Hope Hosp., Inc. v. NC Dep't of Health and Hum. Sevs.*, 174 N.C. App. 266, 620 S.E.2d 873 (2005). *Good Hope Hosp.* involved a Certificate of Need ("CON") issued by the North Carolina Department of Health and Human Services ("the Department") to one of the plaintiffs, a hospital, to build a replacement facility roughly three miles from its existing facility. *Id.* at 268, 620 S.E.2d at 876-77. After the CON was issued by the Department, the plaintiff entered a joint venture with a hospital group, and through this joint venture applied for a second CON, this time for a larger facility, in a different location than the replacement facility that had initially been approved. *Id.* at 268, 620 S.E.2d at 877. The application for this second CON was not approved, and the plaintiff-hospital and plaintiff-hospital group, along with the municipality where the second, larger proposed facility was to be located, sought a declaratory judgment that the proposed, larger facility was not subject to the CON approval requirements under the Department's purview. *Id.* at 269, 620 S.E.2d at 877. They

- 9 -

also filed various claims against the Department and another hospital that had opposed approval of the second facility, including claims for tortious interference with contract, tortious interference with prospective economic advantage, a conspiracy in restraint of trade under N.C. Gen. Stat. § 75–1, unfair and deceptive trade practices under N.C. Gen. Stat. § 75–1.1, and common law unfair competition. *Id.*

In *Good Hope Hosp.*, we held that the *Noerr-Pennington* doctrine applied. *Id.* at 275, 620 S.E.2d at 881. Observing that numerous federal courts, including the Fourth Circuit, had applied the *Noerr-Pennington* doctrine, we noted in particular that *Noerr-Pennington* immunity had been recognized by the federal courts to be applicable "in the context of certificate of need cases." *Id.* at 276, 620 S.E.2d at 881. In holding the doctrine applicable, we affirmed the trial court's dismissal of the plaintiffs' claims on the basis of the *Noerr-Pennington* doctrine because the plaintiffs' complaint did not contain allegations that, if proven, would establish that their lawsuit was not a "mere sham," thus falling within the exception to *Noerr-Pennington* immunity. *Id.* at 276-78, 620 S.E.2d at 881-82. We went on to explain that in CON cases implicating *Noerr-Pennington* immunity, the allegations in the plaintiff's complaint must "show one of three things":

> (1) defendant's advocacy before the Department was objectively baseless and merely an attempt to stifle competition; (2) defendant engaged in a pattern of petitions before the Department without regard to the merit of the petitions; or (3) defendant's misrepresentations before the Department deprived the entire CON proceeding of its

legitimacy.

*Id.* at 276, 620 S.E.2d at 882 (internal marks omitted). Because a review of the complaint revealed no allegations that, if proven, would establish that the sham exception applied, we affirmed the trial court's dismissal of the complaint on the basis of *Noerr-Pennington* immunity. *Id.* at 277-78, 620 S.E.2d at 882.

*Good Hope Hosp.* was not this Court's last word on the applicability of the *Noerr-Pennington* doctrine in North Carolina state courts. *See North Carolina Farm Bureau Mut. Ins. Co. v. Cully's Motorcross Park, Inc.*, 220 N.C. App. 212, 725 S.E.2d 638 (2012), *rev'd in part on other grounds*, 366 N.C. 505, 742 S.E.2d 781 (2013). *Cully's Motorcross* involved the denial of an insurance claim on a policy covering a historic building that burned under circumstances considered suspicious by the plaintiff, the defendants' insurance company. *Id.* at 214-15, 725 S.E.2d at 640-41. Based on the circumstances surrounding the purchase of the building and the fire that destroyed it, the insurance company made a report to law enforcement, and one of the defendants was arrested and charged with obtaining property by false pretenses on the basis of this report. *Id.* at 215, 725 S.E.2d at 641. Thereafter, the insured who was arrested and charged criminally, one of the defendants, asserted a counterclaim against the insurance company, for malicious prosecution. *Id.* at 215, 725 S.E.2d at 641. The criminal charge against this defendant was later dismissed. *Id.*

After a bench trial but before the court entered a judgment, the plaintiff moved for a new trial or, in the alternative, a judgment that it enjoyed *Noerr-Pennington* immunity as a defense to the malicious prosecution claim. *Id.* at 215-16, 725 S.E.2d at 641. The trial court denied the motion, finding the plaintiff liable for malicious prosecution, and awarding the defendants damages and costs, including treble damages and attorney's fees. *Id.* at 215-16, 725 S.E.2d at 641.

We rejected the plaintiff's argument on appeal that the trial court erred in denying the motion for new trial or for judgment as a matter of law on the issue of *Noerr-Pennington* immunity. *Id.* at 232, 725 S.E.2d at 650. We clarified that our decision in *Reichhold Chemicals* was based on the objective reasonableness of the defendant's counterclaims, which did not need to be pleaded through the sham exception to *Noerr-Pennington* immunity where the doctrine did not apply. *Id.* at 231-32, 725 S.E.2d at 650. We reasoned that the trial court's ruling on the motion for a new trial or for judgment as a matter of law based on the *Noerr-Pennington* doctrine was not error because the trial court's basis for concluding that the doctrine did not apply – that the claim for malicious prosecution was asserted without probable cause – was sound. *Id.* at 232, 725 S.E.2d at 650. We therefore affirmed the trial court's conclusion that the doctrine did not apply to the facts before us, despite our holding in *Good Hope Hosp.*, that the doctrine is applicable in North Carolina state courts. *See id.*

iv. Applicability of the *Noerr-Pennington* Doctrine to the Present Case

As noted previously, the present case is not a dispute between competitors in the marketplace, nor does it arise in the CON context, where concerns about the consolidation of market power detrimentally impacting consumers inform decisions by the Department to approve or deny a CON. There is no cause of action pleaded by Plaintiff or Defendants for a conspiracy in restraint of trade under N.C. Gen. Stat. § 75–1, unfair and deceptive practices under N.C. Gen. Stat. § 75–1.1, common law unfair competition, or any other anti-competitive-related harm proscribed by law. Instead, Plaintiff's sole cause of action involves various alleged misrepresentations made by Defendants to the Town about the dangers posed by fly rock, air blasts, and ground vibrations created by the mining operation conducted by Defendants on the property adjacent to the proposed townhome development, including both the approximately 41 acres in Phase I, the sale of which was consummated, and the 5.5 acres in Phase II, which Plaintiff alleges Defendants' "malicious[], intentional[], and [] [un]justifi[ed] misrepresent[ations]" rendered significantly less valuable that it would have been, were it not for these alleged misrepresentations.

We hold that the *Noerr-Pennington* doctrine does not apply to the facts as alleged in Plaintiff's complaint, which we consider true on review of a trial court's decision to grant a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. *See,*

*e.g., Hinson,* 232 N.C. App. at 208, 753 S.E.2d at 826 ("We consider whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory.") (internal marks and citation omitted). The absence of allegations in Plaintiff's complaint pleading the cause of action for tortious interference with prospective economic advantage into the "sham" exception to the *Noerr-Pennington* doctrine is not a defect of the complaint, much less one warranting dismissal of the complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6). This is the case because the allegations in the complaint do not show that Defendants, as a matter of law, enjoy *Noerr-Pennington* immunity from Plaintiff's claim for tortious interference with prospective economic advantage. To be sure, the question would be closer if there were an allegation that actionable anti-competitive-related harms resulted from petitioning activity protected by the First Amendment. However, no such allegation has been made in this case, and there does not appear to be support for such an allegation in the record before us. Accordingly, we conclude that, on the facts of the complaint, the *Noerr-Pennington* doctrine does not apply.

C. The Alleged Misrepresentations

The alleged misrepresentations at issue present a question of first impression under North Carolina law; namely, whether misrepresentations about the dangers of an activity North Carolina law regards as ultrahazardous—indeed, the only activity

regarded by North Carolina law as ultrahazardous—can be overstated and, in their overstatement, become actionable misrepresentations upon which a cause of action for tortious interference with prospective economic advantage can be predicated. We hold that they can.

North Carolina law has recognized blasting activities as ultrahazardous since the Supreme Court's decision in *Guilford Realty & Ins. Co. v. Blythe Bros. Co.*, 260 N.C. 69, 131 S.E.2d 900 (1963). The Supreme Court in *Blythe* identified blasting as "intrinsically dangerous," reasoning that the impossibility of "predict[ing] with certainty the extent or severity of [resulting] consequences" rendered blasting ultrahazardous. *Id.* at 74, 131 S.E.2d at 904. The Supreme Court held that a rule of strict liability applies to actionable harms resulting from blasting. *Id.* Numerous subsequent decisions by the Supreme Court have reiterated the holding of *Blythe*. *See, e.g., Trull v. Carolina-Virginia Well Co.*, 264 N.C. 687, 691, 142 S.E.2d 622, 624 (1965) ("[O]ne who is lawfully engaged in blasting operations is liable without regard to whether he has been negligent, if by reason of the blasting he causes direct injury to neighboring property or premises"); *Falls Sales Co. v. Bd. of Transp.*, 292 N.C. 437, 442, 233 S.E.2d 569, 572 (1977) ("We have held that blasting is an . . . [ultrahazardous] activity and that persons using explosives are strictly liable for damages proximately caused by an explosion"); *Woodson v. Rowland*, 329 N.C. 330, 350, 407 S.E.2d 222, 234 (1991) ("Parties whose blasting proximately causes injury

are held strictly liable for damages . . . largely because reasonable care cannot eliminate the risk of serious harm."). Blasting is the only ultrahazardous activity under North Carolina law. *See Jones v. Willamette Indus.,* 120 N.C. App. 591, 596, 463 S.E.2d 294, 298 (1995); *O'Carroll v. Texasgulf, Inc.*, 132 N.C. App. 307, 311 n. 2, 511 S.E.2d 313, 317 n. 2 (1999); *Kinsey v. Spann*, 139 N.C. App. 370, 374, 533 S.E.2d 487, 491 (2000); *Harris v. Tri-Arc Food Sys.*, 165 N.C. App. 495, 499, 598 S.E.2d 644, 647 (2004); *Vecellio & Grogan, Inc. v. Piedmont Drilling & Blasting, Inc.*, 183 N.C. App. 66, 69, 644 S.E.2d 16, 19 (2007).

The alleged misrepresentations in this case involve the very dangers North Carolina law guards against in its recognition of blasting as ultrahazardous. However, Defendants, the parties engaged in the blasting activities at issue, cite the ultrahazardous nature of their activities as the reason Plaintiff's claim cannot succeed, unlike in the more typical case, where the plaintiff will be relieved of proving an element of his or her case – breach of a duty of reasonable care – against a defendant engaged in blasting activities. Citing the numerous decisions by the Supreme Court reiterating the principle that no amount of reasonable care can "eliminate the risk of serious harm" accompanying an ultrahazardous activity such as blasting, *see Woodson*, 329 N.C. at 350, 407 S.E.2d at 234, Defendants contend that these risks simply cannot be overstated to an extent that they constitute actionable

misrepresentations upon which a claim for tortious interference with prospective economic advantage can be based. We disagree.[1]

It does not follow that simply because no amount of reasonable care eliminates the risk of serious harm from blasting it is impossible, as a matter of law, to overstate the risks of harm from blasting. The former principle is a proposition stating the rationale for imposing strict liability for injuries resulting from blasting; it does not mean that the dangers inherent in the activity cannot be described – or mis-described. And it does not mean that an injury resulting from such mis-description, as is alleged in this case, is not actionable. Similarly, the principle that no amount of reasonable care eliminates the risk of serious harm from blasting does not imply that detrimental reliance on a misrepresentation of the risk of this ultrahazardous activity could not be the basis for recovery on a fraud claim, or for challenging the validity of a contract, a party's consent to which was procured by fraud. We hold that a claim that has as an element the truthfulness of a representation about an activity North Carolina law regards as ultrahazardous can survive a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure even though the content of the representation relates to an activity regarded by the law as ultrahazardous. Success on Plaintiff's claim for tortious interference with prospective economic advantage

---

[1] We also note that the Town apparently did not credit Defendants' alleged misrepresentations, approving the Braddock Park Homes development project despite their vocal opposition to approval of the project.

thus is not precluded by the content of Defendants' representations to the Town, notwithstanding the rule of strict liability applicable to cases in which injury is alleged to result from an ultrahazardous activity.

### D. Tortious Interference with Prospective Economic Advantage

A number of arguments raised by the parties relate to whether the cause of action for tortious interference with prospective economic advantage was properly pleaded by Plaintiff. In a related vein, Defendants argue that facts alleged in the complaint, if established, foreclose the possibility of Plaintiff's success at trial. We disagree, and hold that the claim for tortious interference with prospective economic advantage was properly pleaded, and that the facts alleged in Plaintiff's complaint do not foreclose the possibility of Plaintiff's success at trial.

Generally speaking, "[a]n action for tortious interference with prospective economic advantage is based on conduct by the defendants which prevents the plaintiff[] from entering into a contract with a third party." *Walker v. Sloan*, 137 N.C. App. 387, 392-93, 529 S.E.2d 236, 241 (2000). Tortious interference with prospective economic advantage

> arises when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights.

*Beverage Sys. of the Carolinas v. Assoc. Beverage Repair et al.*, 368 N.C. 693, 701, 784

S.E.2d 457, 463 (2016) (internal marks and citation omitted). Stating a claim for tortious interference with prospective economic advantage requires that the plaintiff "allege facts [] show[ing] that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them[,] which contract would have ensued but for the interference." *Walker*, 137 N.C. App. at 393, 529 S.E.2d at 242.

In its complaint, Plaintiff alleges as follows:

> 17. In the summer of 2013, the Plaintiff began negotiations with Braddock Park Homes, Inc., to sell that entity approximately 45 acres of real property located on Orange Grove and Enoe Mountain Road, Hillsborough, North Carolina.
>
> . . .
>
> 29. At the time Defendants made [certain] malicious misrepresentations to the Town of Hillsborough, it was aware that the Plaintiff was negotiating with Braddock Park Homes for the townhome development project.
>
> 30. On February 28, 2014, the Plaintiff entered into a Purchase and Sale Agreement with Braddock Park Homes, Inc., whereby the Plaintiff agreed to sell Braddock Park Homes, Inc. approximately 41 acres of real property located in Orange Groves and Enoe Mountain Road, Hillsborough, North Carolina at $85,000 per acre.
>
> 31. The February 28, 2014 Purchase and Sale Agreement contained a provision that gave Braddock Home a specified period of time for a "free look" at Phase II (Section B) of the project, which was the 5.5 acres located adjacent to Defendants' Hillsborough Mine, due to the request of the Defendants to deny the approval of that

Phase of the project due to the potential threat of damage to health, safety and welfare of future residents of Enoe Mountain Village due to fly rock, nitrogen and structural damage from the operations of the Defendant's Hillsborough Mine.

32.     The February 29, 2014 [*sic*] Purchase and Sale Agreement further gave Braddock Park Homes, Inc. the right, subject to Plaintiff's acceptance, to terminate Phase II of the Town Home Project from the contract if this threat of liability was not removed to its satisfaction.

33.     On October 9, 2014, Braddock Park Homes, Inc. exercised its right to modify the Purchase and Sale Agreement and terminate Phase II (Parcel B-3) from the Agreement, citing dangers of foundation damage to homes, fly rock from blasting and nitrogen dangers to future inhabitants based on the Defendants misrepresentation to the Town of Hillsborough.

34.     The Defendants' malicious misrepresentations to the Town of Hillsborough were without justification in that at the time they were made, the Defendants were required by their September 11, 2013 Permit to take measures to prevent physical hazard to any neighboring dwelling house if their mining excavation came within 300 feet thereof, regardless of the cost of doing so.

35.     The Defendants intentionally induced Braddock Park, Inc. not to enter into a contract for the purchase of Phase II of the Town Home Project by making these intentional misrepresentations to the Town of Hillsborough.

36.     The Defendants' malicious misrepresentations to the Town of Hillsborough were without justification in that at the time they were made the Defendants had no evidence that the blasting operations from their Hillsborough Mine had endangered persons or neighboring property from fly rock or excessive air blasts or ground

violations.

37. The Defendants' interference with the Plaintiff's pending contract with Braddock Park Homes, Inc. was without justification in that the Defendants' motives were not reasonably related to the protection of the legitimate business interest of the Defendants.

38. In making these intentional misrepresentations, the Defendants acted without justification, not in the legitimate exercise of Defendants' own rights, but with design to injure Plaintiff or obtain some advantage at their expense.

39. By virtue of their malicious misrepresentations made to the Town of Hillsborough, the Defendants induced Braddock Park Homes, Inc. not to perform Phase II of the Purchase and Sale Agreement so that the Defendants could purchase the 5.5 acre tract adjacent to their property at a substantially discounted price.

40. Subsequent to the town's approval of the Town Home Project, the Defendant did in fact offer to purchase the 5.5 acre tract located adjacent to its Hillsborough Mine far below the fair market value for the Property.

41. By virtue of their intentional and malicious misrepresentations made to the Town of Hillsborough, the Defendants tortuously interfered with the Plaintiff's economic advantage by inducing Braddock Park Homes, Inc. not to perform Phase 2 of the Town Home Project.

42. But for the intentional misrepresentations of the Defendants, Braddock Park Homes, Inc. would not have modified the February 29, 2014 Purchase and Sale Agreement to eliminate Phase II of the Town Home Project.

43. By virtue of the Defendants' tortious interference with the Plaintiff's prospective economic advantage, the Plaintiff has suffered damages in the amount of $467,755.

Our review of the allegations in Plaintiff's complaint confirms that Plaintiff has alleged (1) the existence of a valid business relationship; (2) interference with that business relationship by an outsider; (3) the absence of a legitimate justification for the alleged interference by the outsider; (4) malice by the outsider in engaging in the alleged interference; (5) causation from the alleged interference resulting in damages to Plaintiff; and (6) damages suffered by Plaintiff to a sum certain, $467,755. These allegations are adequate to make out a cause of action for tortious interference with prospective economic advantage.

Defendants argue that Plaintiff has not adequately pleaded a claim for tortious interference with prospective economic advantage because the alleged interference did not induce Braddock Park Homes to refrain from entering into a new contract with Plaintiff but instead only induced Braddock Park Homes to exercise its modification rights to back out of Phase II of its multi-phase development deal with Plaintiff. Defendants suggest that it would be an expansion of the tort of tortious interference with prospective economic advantage under North Carolina law "to include . . . modifications in addition to prevented contracts and contract breaches." We disagree.

The tort of tortious interference with prospective economic advantage under North Carolina law not only embraces instances in which "the defendant . . . induce[s] a third party to refrain from entering into a contract with the plaintiff," *see MCL*

*Automotive v. Town of Southern Pines*, 207 N.C. App. 555, 571, 702 S.E.2d 68, 79 (2010), it also extends to inducement by a third party, the outsider, of a party to a contract "to terminate or fail to renew [that] contract," *see Robinson, Bradshaw & Hinson v. Smith*, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850 (1998). The reason the difference between the interference preventing a new contract from being made, resulting in the cancellation or termination of an existing agreement, or prompting a party to an existing agreement to allow the agreement to expire rather than renew it for an additional term, is not a meaningful one as this element relates to a party's liability, is that in all three variations, the requirement is met that the prospective economic advantage with which the outsider interferes is substantial enough to permit recovery, and not a "mere expectancy," which has been held to be insufficient. *See Beverage Sys. of the Carolinas*, 368 N.C. at 701, 784 S.E.2d at 463.

Similarly, the difference between a party to an agreement exercising modification rights in a multi-phase development deal to terminate one part of a multi-part agreement, as is alleged to have occurred in this case, and the party canceling the entire agreement, is not relevant to whether the third party whose interference resulted in the choice to terminate the contract is liable for tortious interference with the prospective economic advantage derived from one or all phases of the multi-part agreement. As we observed in *Reichhold Chemicals*, "[i]nducing a person not to enter into a contract is as much a tort as interference with an

established contract." 146 N.C. App. at 151, 555 S.E.2d at 290. So too is inducing a person or entity to terminate a contract, *see Smith*, 129 N.C. App. at 317, 498 S.E.2d at 850, such as in this case, by allegedly inducing a third party not to consummate a later phase of a multi-phase development deal, regardless of whether the contractual vehicle defeating the prospective economic advantage is denominated a termination, cancellation, prevention, rescission, or other language of similar import and effect. Accordingly, we hold that the tort of tortious interference with prospective economic advantage under North Carolina law includes contractual modifications equivalent in effect to terminations of parts of multi-part agreements.

## III. Conclusion

We reverse and remand the trial court's dismissal of Plaintiff's complaint for failure to state a claim upon which relief can be granted for three reasons. First, the allegations in the complaint do not establish the *Noerr-Pennington* doctrine applies to this case to bar Plaintiff's claims. Second, the alleged misrepresentations are actionable under North Carolina law even though their content relates to activity regarded by the law as ultrahazardous. Third, the cause of action for tortious interference with prospective economic advantage alleged in Plaintiff's complaint is properly pleaded, and this tort includes terminations of parts of multi-part agreements.

REVERSED AND REMANDED.

Judges STROUD and HAMPSON concur.