Lowder Constr., Inc. v. Phillips, 2020 NCBC 1.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF RANDOLPH | 18 CVS 686 |

LOWDER CONSTRUCTION, INC.,

          Plaintiff,

     v.

RONALD E. PHILLIPS; KEVIN W. GLENN; and ATLANTIC WOOD & TIMBER, LLC,

          Defendants.

**ORDER AND OPINION ON LOWDER CONSTRUCTION, INC.'S MOTION TO DISMISS RONALD E. PHILLIPS'S COUNTERCLAIM**

RONALD E. PHILLIPS,

          Counterclaim Plaintiff,

     v.

LOWDER CONSTRUCTION, INC. and J. DEAN LOWDER

          Counterclaim Defendants.

THIS MATTER comes before the Court on Plaintiff/Counterclaim-Defendant Lowder Construction, Inc.'s Motion to Dismiss the Sixth Amended and Supplemental Counterclaim filed by Ronald E. Phillips. ("Motion," ECF No. 39.)

THE COURT, after considering the Motion, the briefs in support of and in opposition to the Motion, the arguments of counsel at the hearing, the pleadings at issue, and other appropriate matters of record, CONCLUDES that the Motion should be GRANTED.

    *Roberson, Haworth & Reese, PLLC, by Christopher C. Finan, Esq. for Plaintiff Lowder Construction, Inc.*

    *David E. Shives, PLLC, by David E. Shives, Esq. for Defendant Ronald E. Phillips.*

McGuire, Judge.

## I.  FACTS AND PROCEDURAL BACKGROUND

1.  Counterclaim-Plaintiff Ronald E. Phillips ("Phillips") provides sales, marketing, and operational services to various businesses as a business consultant. (ECF No. 33 at CC, ¶ 6.)  Counterclaim-Defendant Lowder Construction, Inc. ("LCI") is a commercial construction company that provides framing services for hotels and apartment buildings.  (*Id.* at ¶ 7.)  LCI retained Phillips as an independent contractor from January 2014 to late-December 2017.  (*Id.* at ¶¶ 6, 9, 28.)  Defendant Kevin W. Glenn ("Glenn") was an LCI employee who worked closely with Phillips at all times relevant to this matter.  (*Id.* at ¶¶ 64–65.)

2.  Phillips and Glenn ended their respective employments with LCI in late December 2017 and were hired by Defendant Atlantic Wood & Timber, LLC ("Atlantic").  Atlantic is a competitor of LCI.

3.  On March 14, 2019, LCI filed its First Amended Complaint ("FAC") in this action against Phillips and the other Defendants.  (ECF No. 4.)  In the FAC, LCI alleges, *inter alia*, claims against Phillips for misappropriation of trade secrets; conversion; tortious interference with prospective economic advantage; civil conspiracy; and unfair or deceptive trade practices in violation of N.C.G.S. § 75-1.1 ("UDTPA").  (ECF No. 4.)  The claims are based primarily on Phillips's alleged misappropriation of LCI's trade secrets, including a computer-generated modeling process, and other customer and business information.  (*Id.*)

4. In its FAC (ECF No. 4), LCI alleges that it "independently created and developed a unique, proprietary method, process and technique . . . to quickly and accurately develop, generate and prepare for submission to prospective clients, full and complete three-dimensional structural renderings of proposed Projects (the 'Structural Model')." (*Id*. at ¶ 11.) Generally, LCI's claims against Phillips arise from work Phillips and Glenn performed for LCI using LCI's Structural Model. LCI alleges that "[t]he Structural Model, . . . consist[s] of a significant amount of specially-purposed and customized software." (*Id*. at ¶ 16.) LCI further alleges that the Structural Model automatically generates "material takeoffs," a full, complete, and accurate list of all necessary materials to complete a proposed project. LCI alleges that this gives it a significant, commercially-valuable advantage because LCI's competitors routinely generate "material takeoffs" manually, which is a time-consuming and inaccurate process. (*Id*. at ¶ 15.) LCI claims the Structural Model is a proprietary trade secret protected under the North Carolina Trade Secrets Protection Act, N.C.G.S. §§ 66-152 *et seq*. (*Id*. at ¶ 24.) LCI claims that Phillips, along with Glenn, misappropriated the Structural Model, along with other confidential customer and business information, and disclosed and used the Structural Model and other confidential information to help Atlantic unfairly compete with LCI.

5. Phillips filed his Answer and Counterclaim on June 17, 2019. As his "Sixth Amended and Supplemental Counterclaim" against LCI, Phillips alleges that LCI filed this lawsuit against him for the purpose of interfering with his ability to

compete with LCI, or assist Atlantic with competing, and that such conduct is an unfair or deceptive trade practice in violation of the UDTPA ("Sixth Counterclaim"). (ECF No. 33 at CC, ¶¶ 61–112.) In the Sixth Counterclaim, Phillips alleges that LCI's allegations in the FAC are "false." (*Id.* at CC, ¶ 63.) Phillips alleges that the Structural Model is not a trade secret, but simply consists of two or more commercially available software programs that have not been modified, altered, or upgraded by LCI in any way. More specifically, in his Sixth Counterclaim, Phillips alleges in relevant part:

a. In late 2016, LCI purchased a Dell Precision 5810 Desktop computer for the dedicated purpose of running a Building Information Modeling software program to edit and/or manipulate three-dimensional structural models of buildings (the "Computer"). (*Id.* at CC, ¶ 68.)

b. LCI purchased two software licenses for programs that were downloaded onto the Computer: "(a) Revit, a software product created by Autodesk, Inc. and purchased from Advanced Solutions which is capable of creating three-dimensional structural models for larger, commercial construction projects ("Revit"); and (b) StrucSoft Solutions North America's MWF ("StrucSoft"), a plugin or application that works within Revit to specifically assist with framing issues." (*Id.* at CC, ¶ 70.)

c. In September 2017, LCI formed Construction Modeling & Management, LLC ("CM&M"), and LCI transferred the Revit and StrucSoft licenses

and its contract with Advanced Solutions to CM&M. (*Id.* at CC, ¶¶ 67, 71.)

d.  Starting in February 2017, LCI, and later CM&M, hired Advanced Solutions to construct most of the structural models LCI sought to utilize in connection with its projects. Advanced Solutions used Revit to construct the models, and then billed LCI (and CM&M) for its modeling services. LCI and CM&M engaged Advanced Solutions to create structural models only for projects that LCI had already been awarded. "Advanced Solutions never created a structural model for the purposes of assisting LCI with a bid on a particular project." (*Id.* at CC, ¶¶ 73–74.)

e.  After Advanced Solutions sent a structural model to Glenn, Glenn used Revit and StrucSoft to complete the framing component of the structural model. "Glenn only completed the framing components for models of projects that had already been awarded to LCI; Glenn never generated the framing component of a structural model for the purpose of assisting LCI with a bid on a particular project." (*Id.* at CC, ¶ 75.)

f.  Neither Glenn nor Advanced Solutions created or developed any unique or customized software, program, application, or plugin for LCI to use in the Structural Model. "Advanced Solutions did provide Glenn with certain macroinstructions ("Macros") for use within Revit in order to more efficiently accomplish specific tasks. Glenn did not create or assist

in the creation of the Macros . . . ." Phillips alleges, upon information and belief, that the Macros are owned by Advanced Solutions and/or Autodesk, Inc., and not LCI. (*Id.* at CC, ¶¶ 76–79.)

6. Phillips also alleges that LCI never took any steps to secure or protect the Computer or the software on it. (*Id.* at CC, ¶¶ 83–86.) Phillips further alleges "Revit, StrucSoft, and the Macros are freely available in the market for purchase and use by any individual or entity, including LCI" and "LCI did not, does not, and cannot possess any trade secret in connection with any structural model." (*Id.* at CC, ¶¶ 90–91.)

7. On December 14, 2017, LCI executed an agreement transferring ownership of the Computer, with the loaded Revit and StrucSoft software, to Glenn as payment for certain bonus compensation due to him. (*Id.* at CC, ¶ 81.)

8. Atlantic does not hold licenses for Revit or StrucSoft and "could not use those software programs or associated Macros." (*Id.* at CC, ¶ 98.)

9. Phillips alleges that "LCI's claim of misappropriation of trade secrets and each of its other claims, all founded upon its purported trade secret in a 'Structural Model,' are objectively frivolous, unreasonable, and non-justiciable." (*Id.* at CC, ¶ 96.) "LCI has, without justification, intentionally attempted to interfere with the agreements between Atlantic and its employee Glenn and contractor Phillips, and has also interfered with Atlantic's and Phillips'[s] prospective business opportunities" and "[s]pecifically, LCI intends to disrupt, impede and prevent Phillips'[s] contract and potential future employment and/or contracts with Atlantic,

in the absence of a non-compete agreement with Phillips, in order to gain a competitive advantage in the market and deprive Phillips and Atlantic of the competitive benefits afforded by such relationships." (*Id.* at CC, ¶¶ 101–02.)

10. On July 19, 2019, LCI filed the Motion. LCI simultaneously filed a brief in support of the Motion. (Mem. Supp. Pls.' Mot. to Dismiss, ECF No. 40.) The Motion seeks dismissal of Phillips's Sixth Counterclaim for unfair or deceptive trade practices in violation of the UDTPA.

11. Phillips filed a response in opposition to the Motion. (ECF No. 50.) On September 9, 2019, LCI filed a reply brief in support of the Motion. (ECF No. 55.)

12. The Court held a hearing on the Motion on September 25, 2019, at which counsel for the parties made oral arguments.

13. The Motion has been fully briefed and argued, and is now ripe for determination.

II. STANDARD OF REVIEW

14. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the [counterclaim], treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the [counterclaim] on its face reveals that no law supports the plaintiff's claim; (2) the [counterclaim] on its face reveals the absence of facts sufficient to make a good claim; or (3) the [counterclaim] discloses

some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).

15. In deciding a motion to dismiss, the court must construe the complaint liberally and accept all well-pleaded allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). The court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation and quotations omitted).

16. In addition, "when ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of [the counterclaim] and to which the [counterclaim] specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

III. ANALYSIS

17. LCI seeks dismissal of Phillips's Sixth Counterclaim against LCI for unfair or deceptive trade practices in violation of the UDTPA. LCI argues that Phillips's Sixth Counterclaim should be dismissed because LCI's claims against Phillips are protected by the *Noerr-Pennington* doctrine, "which provides that a party who seeks redress by filing a lawsuit is immune from claims that are based solely on the pursuit of that lawsuit." *Velocity Solutions, Inc. v. BSG Fin., LLC*, 2016 NCBC

LEXIS 19, at *15 (N.C. Super. Ct. Feb. 22, 2016) (following *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139 (1961)). As the Supreme Court of North Carolina recently explained:

> The *Noerr-Pennington* doctrine originates from the U.S. Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed.2d 464 (1961) ("*Noerr*"), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed.2d 626 (1965) ("*Pennington*"), which are together its namesake. In *Noerr*, the Supreme Court held that the First Amendment protects businesses when they engage in certain petitioning activities, such as initiating litigation, providing them with immunity from antitrust liability when their conduct is aimed at influencing governmental action and their petitioning activity otherwise potentially violates §§ 1 and 2 of the Sherman Act, which proscribe conspiracies to restrain trade and attempts to impose monopolies, respectively. *See* 365 U.S. at 135–37, 81 S. Ct. at 528–29. *Pennington* then reiterated the core teaching of *Noerr*: that immunity from antitrust liability under the First Amendment exists for 'concerted effort[s] to influence public officials regardless of intent or purpose.' 381 U.S. at 670, 85 S. Ct. at 1593.

*Cheryl Lloyd Humphrey Land Inv. Co., LLC v. Resco Prods.*, 831 S.E.2d 395, 399 (N.C. Sup. Ct. 2019).

18. The immunity provided by the *Noerr-Pennington* doctrine, however, "can be lost if the litigation is only a sham. Under the sham-litigation exception to the *Noerr-Pennington* doctrine, '[t]he institution of a lawsuit may be the basis for an unfair trade practices claim if the lawsuit is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *Velocity Solutions, Inc.*, 2016 NCBC LEXIS 19, at *15 (quoting *United States v. Ward*, 618 F. Supp. 884, 907 (E.D.N.C. 1985)). "[T]he 'sham litigation'

exception to the *Noerr-Pennington* doctrine would apply to claims under [the UDTPA] when 1) the claim asserted is 'objectively meritless' and 2) the court finds 'the litigant's subjective motivation' was an unlawful intent to 'interfere directly with the business relationships of a competitor.'" *Lorillard Tobacco Co. v. R.J. Reynolds Tobacco Co.*, 2011 NCBC LEXIS 31, at *15–16 (N.C. Super. Ct. Aug. 8, 2011) (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)). "Proving that the filing of a lawsuit is a mere sham carries an extremely high burden, and, even if the Court assumes that an action was brought for no legitimate purpose and with a subjective anti-competitive intent, it can still conclude that the suit is objectively reasonable because it is not utterly baseless." *Velocity Solutions, Inc.*, 2016 NCBC LEXIS 19, at *15 (quotations omitted).

19.     In deciding whether Phillips's Sixth Counterclaim is a sham, the Court first must determine whether LCI's lawsuit against Phillips is "objectively reasonable." "A lawsuit is objectively reasonable if an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome." *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 157, 555 S.E.2d 281, 293 (2001) (citation and quotation marks omitted). Only if the Court concludes that LCI's lawsuit is not objectively reasonable does it consider whether the suit was brought for a subjective anti-competitive purpose. *Lorillard Tobacco Co.*, 2011 NCBC LEXIS 31, at *16 ("[T]he inquiry into subjective intent only follows a finding that the suit is objectively baseless and does not inform that initial objective determination."). As this Court succinctly summarized

> [The] inquiry . . . requires the Court to consider whether, accepting the allegations of the Counterclaim as true and allowing all favorable factual inferences from those facts, the Court can and should make that determination as a matter of law without need for further discovery. The controlling ultimate issue is whether [p]laintiffs' Complaint is 'objectively reasonable.' If it is, [p]laintiffs' subjective intent in filing the suit is irrelevant, and further inquiry into that intent is not necessary.

*Id.* at \*2. Accordingly, the Court first must decide whether LCI's FAC is objectively reasonable.

20. Phillips's Sixth Counterclaim against LCI alleges that LCI's institution of the present litigation "is a mere sham" intended to interfere with Phillips's contract and potential future employment with Atlantic, and that LCI's act of filing the "objectively unreasonable, frivolous, and baseless" lawsuit against him constitutes an unfair or deceptive trade practice. (ECF No. 33 at CC, ¶¶ 102, 108.) Rather than addressing the entirety of LCI's lawsuit, Phillips's argument in opposition to the Motion focuses exclusively on LCI's claim against Phillips for misappropriation of trade secrets. Phillips contends that if the misappropriation claim is not objectively reasonable, then LCI's lawsuit is utterly baseless and a sham. (ECF No. 50, at pp. 9–13; ECF No. 48, at pp. 18–22.) Phillips's argument relies heavily on his allegations in the Sixth Counterclaim denying LCI's allegations regarding the proprietary nature of the Structural Model, and confidential customer and business information. (*Id.*)

21. In analyzing whether LCI's lawsuit is "objectively reasonable," on the one hand, or "utterly baseless," on the other, the Court must decide whether "'an objective litigant could conclude that the suit is reasonably calculated to elicit a

favorable outcome.'" *Reichhold Chems., Inc.*, 146 N.C. App. at 157, 555 S.E.2d at 293 (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993) ("[T]he lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.")).

22. As discussed thoroughly in the Order and Opinion on Phillips's Motion for Judgment on the Pleadings (ECF No. 62), LCI has sufficiently alleged a viable claim for misappropriation of trade secrets against Phillips to survive a motion for judgment on the pleadings. LCI alleges that it developed its own proprietary modeling and costing process, the Structural Model, and that the Structural Model provides LCI with unique advantages over its competitors. (ECF No. 4, at ¶¶ 11–16.) LCI alleges that Phillips, along with Glenn, "focused, to a significant degree, on the creation, development and implementation of the Structural Model" and "had significant, direct and unfettered access to all constituent components—both tangible and intangible—of the Structural Model." (*Id.* at ¶¶ 54–55.) LCI further alleges that: while Phillips was still employed with LCI, he directed Glenn to provide an example of a Structural Model to Atlantic; Phillips accepted employment with Atlantic but continued working for LCI and provided Atlantic with copies of structural models for projects on which LCI was bidding; and after Phillips began working for Atlantic, he helped Atlantic win projects from LCI customers using LCI's trade secrets and

confidential customer and business data. (*Id*. at ¶¶ 79–94.) LCI alleges that it has been injured by Phillips's conduct. (*Id*. at ¶ 105.)

23. While Phillips alleges that the Structural Model is not a trade secret, and undoubtedly will contest LCI's allegations that he misappropriated trade secrets, the Court finds that, based on LCI's allegations in the FAC, "an objective litigant could conclude that" the claim for misappropriation "is reasonably calculated to elicit a favorable outcome" for LCI. *Reichhold Chems., Inc.,* 146 N.C. App. at 157, 555 S.E.2d at 293.

24. In addition, in the Sixth Counterclaim, Phillips specifically alleges only that the Structural Model is not a trade secret. Phillips does not specifically allege how or why LCI's confidential customer and business data are not trade secrets, or why LCI's claim that Phillips misappropriated the customer and business data is not objectively reasonable and not calculated to seek a favorable outcome on LCI's claim for misappropriation of trade secrets. Similarly, Phillips does not specifically allege on what grounds an objective litigant could conclude that LCI's allegations that Phillips interfered with LCI's opportunity to win at least two specific projects offered by LCI's customers do not support its claim for tortious interference with prospective economic advantage. (ECF No. 4, at ¶¶ 140–46.) Therefore, even if Phillips has alleged that LCI's claim for misappropriation of the Structural Model is baseless, he does not adequately allege that LCI's other claims are utterly baseless. *Velocity Solutions, Inc.*, 2016 NCBC LEXIS 19, at *15.

25.     As existing authority makes clear, the burden of establishing an exception to the protection to petition the courts provided by the *Noerr-Pennington* doctrine is a heavy one that must be reserved for those lawsuits that are truly "utterly baseless"; the courts should not be hesitant to dismiss claims for unfair or deceptive trade practices grounded in another party's decision to file a lawsuit. *See, e.g.,* *Lorillard Tobacco Co.*, 2011 NCBC LEXIS 31; *Velocity Solutions, Inc.*, 2016 NCBC LEXIS 19. Phillips's allegations in the Sixth Counterclaim fail to support his claim that LCI's lawsuit against him is objectively unreasonable or utterly baseless. Therefore, the Motion should be GRANTED.

IV.     CONCLUSION

THEREFORE, IT IS ORDERED that the Motion is GRANTED, and Phillips's Sixth Counterclaim is dismissed with prejudice.


SO ORDERED, this the 8th day of January, 2020.


       /s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases