Glover Construction Co. v. Sequoia Servs., LLC, 2020 NCBC 49.

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 18 CVS 1900 |

GLOVER CONSTRUCTION
COMPANY, INC.

      Plaintiff,

    v.

SEQUOIA SERVICES, LLC,
JOHN MICHAEL GLOVER, J.
MARK GLOVER, and
CHRISTOPHER JAMES
COLANGELO,

      Defendants.

**ORDER AND OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Plaintiff Glover Construction Company, Inc.'s Motion for Partial Summary Judgment ("Plaintiff's Motion," ECF No. 45), and Defendants Sequoia Services, LLC, John Michael Glover, J. Mark Glover, and Christopher James Colangelo's Motion for Summary Judgment ("Defendants' Motion," ECF No. 47) (collectively, the Plaintiff's Motion and the Defendants' Motion are the "Motions").

THE COURT, having considered the Motions, the evidentiary materials filed by the parties, the briefs filed in support of and in opposition to the Motions, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES that the Plaintiff's Motion should be GRANTED, in part, and DENIED, in part, and the Defendants' Motion should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Gary S. Parsons, Kimberly Marston, and Joshua A. Yost, for Plaintiff Glover Construction Company, Inc.*

*Tuggle Duggins P.A., by Denis E. Jacobson, Jeffrey S. Southerland, and Brandy L. Mansouraty, for Defendants Sequoia Services, LLC, John Michael Glover, J. Mark Glover, and Christopher James Colangelo.*

McGuire, Judge.

I.    INTRODUCTION

1.    The themes involved in this lawsuit are all too familiar to the Business Court.  The plaintiff company alleges that a disgruntled employee, prior to resigning, schemed to start a competing business, but shortcut the usual processes for building that business by stealing plaintiff's "trade secrets," poaching plaintiff's key employees for the new venture, and soliciting plaintiff's best customers.  These types of so-called *Sunbelt Rental* cases make up a not insignificant portion of the Court's docket.[1]

2.    The minor variation on the theme in this case is that the disgruntled employee, Defendant John Michael Glover ("John Michael"), is the grandson of Plaintiff Glover Construction Company, Inc.'s ("GCC") founder and president, John M. Glover ("J.M."), and was the heir apparent to take over leadership of GCC, but not quickly enough to satisfy John Michael.  GCC claims that instead of being patient, John Michael secretly created a competing company, Defendant Sequoia Services, LLC ("Sequoia"), with the assistance of his brother-in-law, Defendant Christopher James Colangelo ("Colangelo"), and John Michael's father, Defendant J. Mark Glover

---

[1] Indeed, Plaintiff contends that the facts in this case compare favorably to those in *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2003 NCBC LEXIS 6 (N.C. Super. Ct. May 2, 2003), *aff'd*, 174 N.C. App. 49, 620 S.E.2d 222 (2005).

("Mark"), a GCC vice president. GCC contends that John Michael breached fiduciary duties to GCC, misappropriated GCC's trade secrets, solicited away GCC's key employees, and interfered with GCC's customer relationships to create Sequoia and directly compete for work from GCC's customers. John Michael left a trail of text messages and emails upon which GCC relies in pursuing its claims.

3. Defendants, of course, deny that John Michael, Mark, or Colangelo did anything more than lawfully prepare to compete with GCC through Sequoia, and that this lawsuit is motivated solely by J.M.'s desire to exact revenge on Defendants. Accordingly, the parties bitterly dispute many of the facts underlying this matter.

II. FACTS

4. "The Court does not make findings of fact when ruling upon a motion for summary judgment. But to provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017).

**A. GCC and John Michael's Employment**

5. GCC is a family-owned North Carolina corporation that specializes in mass excavation and other construction projects. GCC was founded in the 1950s and is now one of the largest mass excavation ("earth-moving") firms on the East Coast. GCC performs projects in various operational areas, including commercial distribution centers, residential, airports, dams, highway and infrastructure, energy, and landfills. GCC's services include site preparation, grading, soil stabilization,

compaction, topsoil removal and replacement, landfill construction, landfill closure, grading, utility relocation, and coal ash excavations.

6. J.M. is the president of GCC. At all relevant times, J.M.'s two sons, Mark and Matthew Glover ("Matt"), served as GCC vice presidents. Mark's employment was terminated on February 15, 2018, but he remains a 20% shareholder of GCC and a member of its board of directors.

7. John Michael is J.M.'s grandson and Mark's son. John Michael began full-time employment with GCC in 2012 as the Director of Engineering and Construction, and resigned on April 3, 2017. John Michael was also Secretary of GCC during his employment. The parties dispute when John Michael resigned as Secretary. (Complaint, ECF No. 3, at ¶¶ 38, 64; John Michael Answer, ECF No. 19, at ¶¶ 38, 64.)

8. Among his achievements, John Michael built customer relationships with Duke Energy ("Duke") and Dominion Energy ("Dominion") and secured several lucrative contracts with Duke and Dominion for coal ash clean-up services. At the time John Michael resigned, GCC had two active projects for Dominion at the Possum Point Power Station in Prince William County, Virginia and at the Bremo Power Station in Fluvanna County, Virginia. GCC also had two ongoing projects with Duke in New Hanover County, North Carolina. Through the projects with Duke and Dominion, John Michael gained valuable experience and expertise in coal ash clean-up and developed business relationships with key customer contacts. (ECF No. 3, at ¶ 14.)

9. Plaintiff contends that through his employment with GCC, John Michael

> had access to, [and] intimate knowledge of GCC's [b]usiness [r]elationships and [e]xpectancies and its confidential and proprietary information (such as the names, contacts, addresses and phone numbers of GCC's employees, customers and vendors; the equipment and project needs of GCC's customers; GCC's costs, bidding, and pricing strategies; GCC's marketing practices and materials; GCC's hiring and allocation of human resources; employee compensation; specific project billing data; equipment and personnel T&M rates; profit and loss data and other financial information; GCC's bond capacity, insurance and workers compensation coverage; company software information; and other confidential business information (GCC's "Trade Secrets")).

(*Id.* at ¶ 16.)[2] Defendants dispute that GCC's information was a trade secret. (Defs.' Br. in Supp., ECF No. 48, at pp. 10–11.)

10. It is undisputed that during his employment with GCC, John Michael became the "face" of GCC to its customers and employees. J.M. admittedly saw John Michael as his successor and was grooming him to take over leadership of GCC. From May 2016 through early 2017, J.M., John Michael, Mark, and Matt negotiated over a potential succession plan for John Michael to become president of and a shareholder in GCC. (See ECF No. 80, at pp. 6–7 and the record citations therein for a discussion of the negotiations.) Ultimately, the parties were not able to reach an agreement. (John Michael Dep., ECF No. 50 at Ex. 5, 103:8–105:22.)

---

[2] Plaintiff alleges that Mark had access to and knowledge of the same information.

**B.    Colangelo and the Creation of Sequoia**

11.    Colangelo is married to Mark's daughter, and John Michael's sister, Rachel Glover.  Colangelo was not employed with GCC.

12.    In April 2015, John Michael and Colangelo began discussing the formation of a business entity through which John Michael and Colangelo could make money from GCC's contract with Dominion.  On April 24, 2015, they exchanged the following text messages:

> John Michael: What if I set up a LLC as a 3rd member of the contract to buy materials?
>
> Colangelo: I don't think it's necessary.  In the end the materials will need to be paid for by one of the two parties anyway [.]
>
> Colangelo: Or both [.]
>
> John Michael: Your missing my point... I would be the sole owner of the LLC? I just would have to figure out how to hide ownership [.]
>
> John Michael: Then I could get my cut [.]

(ECF No. 76, at p. 1.)

13.    In September 2015, John Michael and Colangelo formed Sequoia as a Delaware limited liability company with headquarters in Greensboro, North Carolina.  The Statement of Organization for Sequoia lists Colangelo and John Michael as "the Managing Member(s) of [Sequoia] until their successors are elected and qualify."  (ECF No. 49.15.)  However, the parties dispute whether John Michael has an ownership interest in Sequoia.  GCC points to evidence, *inter alia*, showing that a credit application to a Ford Motors dealership in May 2016 lists John Michael

and Colangelo as each 50% owners of Sequoia (ECF No. 72.3, at p. 3) and that John Michael signed documents to be added as a "member" to Sequoia's bank account (*Id.* at p. 5). Defendants, however, argue that John Michael has never received a K-1 from Sequoia and has never reported himself as an owner on tax returns or personal financial statements. (2016, 2017, and 2018 Schedule K-1 for Sequoia, ECF Nos. 62.3–62.5.) In addition, John Michael and Colangelo claimed in their respective depositions that John Michael is no longer a member of Sequoia (John Michael Dep., ECF No. 49.6, at 77:24–25; Colangelo Dep., ECF No. 50 at Ex. 8, 57:10–58:9), but there are no documents in the record that show that John Michael formally withdrew his membership interest in Sequoia.

14. In February 2016, GCC entered into a $4.4 million subcontract with Sequoia for dewatering work at Dominion's Possum Point Power Station. (ECF No. 49.18; ECF No. 49.19.) GCC subsequently entered into additional subcontracts with Sequoia for dewatering services on other GCC projects. (Denise T. Dauphin Dep., ECF No. 68.7, at 167:14–168:4; Denise T. Dauphin Expert Report, ECF No. 61.2, at Ex. D-4.1.) From 2015 to 2018, Sequoia invoiced GCC over $14 million for dewatering subcontracts. (*Id.*)

15. J.M. and Matt were aware of Colangelo's involvement in Sequoia and the GCC subcontracts awarded to Sequoia. (GCC 30(b)(6) Dep., ECF No. 50 at Ex. 13, 154:3–23; ECF No. 50, at Ex. 28.) However, John Michael never disclosed his involvement in Sequoia to J.M. or Matt. (John Michael Dep., ECF No. 49.6, at 76:17–77:15.)

### C. John Michael's Efforts on Behalf of Sequoia Prior to His Resignation from GCC

16. During the period in which John Michael was negotiating over his future status with GCC, he also had discussions with Colangelo about building up Sequoia's business in the event John Michael needed to leave GCC. In May 2016, when J.M. rebuffed John Michael's initial suggestion that he immediately be made president of GCC during a hunting trip to Argentina, John Michael texted Colangelo:

> I'm just not going to bring it up down here anymore and talk to dad [Mark] and see what he wants to do. I would say [S]equoia may be getting ready to go on a hiring spree[.]

(ECF No. 49.12, at p. 13.) In another text message sent during the same trip, John Michael told Colangelo:

> Where I am now is when I get back I will talk to my dad [Mark] and let him make the call if he wants to fight it now then I will go to my grandpa and Matt and say either I'm president or me and everyone else leaves or if my dad wants to play it out [w]e will start feeding work to [S]equoia and build that and in 3 years walk away and that will be better than [GCC] ever was and Matt will be left with absolutely nothing.

(*Id.* at p. 14.)

17. After returning from Argentina, John Michael texted Colangelo that "Dad [Mark] wants to make the stand so be ready to start hiring [if] things go south." (ECF No. 76, at p. 70.)

18. Throughout late 2016 and early 2017, John Michael sent numerous GCC documents to Colangelo, including GCC's Time & Material rates ("T&M Rates") (ECF

No. 79, at pp. 3–7), GCC's equipment rates (*Id.* at p. 51), and a GCC work plan for a construction project in Asheville (*Id.* at pp. 15–16).

19.     On March 19, 2017, John Michael texted Colangelo: "Had a real good conversation with dad [Mark] today.  He said we could use his resum[é] on anything we wanted he just doesn't want to leave the same time as me." (ECF No. 76, at p. 158.)

20.     It is undisputed that, during March and April 2017, John Michael made a copy of all the emails and other files on his GCC-issued laptop computer for his own future use, sought out assistance with and deleted the hard drive on his laptop computer, communicated regularly with Colangelo about his efforts to save and store his GCC files and emails prior to resigning, and assisted at least one other GCC employee, Merit Cross ("Cross"), a GCC project manager who was planning to join Sequoia, in deleting the hard drive on his company-issued computer.  (John Michael Dep., ECF No. 49.6, at 128:17–129:13, 131:2–133:4, 134:4–10.)   There is also no dispute that John Michael did not save the emails and files on his laptop to a network server or anywhere else accessible to GCC.  (See ECF No. 46, at pp. 6–11 and the record citations therein for a discussion of the steps John Michael took in deleting his GCC emails and files on his GCC computer.)

21.     John Michael resigned from GCC on April 3, 2017 and accepted Colangelo's offer to serve as Sequoia's vice president that evening.[3]  (ECF No. 49.27.) Over the two-year period after John Michael joined Sequoia, twenty-four other GCC

_____

[3] Defendants contend that John Michael did not begin to work for Sequoia until June 2017. (John Michael Dep., ECF No. 49.6, at 112:2–22.)

employees also left GCC and started working for Sequoia. (Denise T. Dauphin Dep., ECF No. 50 at Ex. 9, 287:7–21.) GCC alleges that most of these individuals were key, long-term employees of GCC. (ECF No. 3, at ¶¶ 40, 45.) Cross announced his resignation from GCC the day after John Michael resigned, and he also began working with Sequoia. Shortly after he was terminated from GCC in February 2018, Mark began working for Sequoia as well. (Denise T. Dauphin Expert Report, ECF No. 61.2, at Ex. D-7.)

22. GCC was able to recover the emails that John Michael had deleted from his GCC email account within five days after John Michael's resignation. (ECF No. 49.26; Catherine Glover Frazier Dep., ECF No. 68.3, at 291:5–292:5.) However, GCC was not able to recover the other data or files that were wiped from John Michael's computer. (Glover 30(b)(6) Dep., ECF No. 49.8, at 300:25–303:14.) Nevertheless, during the litigation, John Michael's external hard drive was imaged and he ultimately provided GCC with all of the files. (Defs.' Br. in Opp., ECF No. 80, at p. 9; John Michael Aff., ECF No. 68.2, at ¶¶ 12–16.)

23. During John Michael's employment with GCC, GCC did not have an employee handbook, did not require employees to sign confidentiality or noncompete agreements, and did not have any written policies—formal or informal—related to document retention or the handling and dissemination of confidential information. (Catherine Glover Frazier Dep., ECF No. 68.3, at 36:8–20, 290:10–17; John Michael Aff., ECF No. 68.2, at ¶ 3.) GCC did, however, provide laptop computers to management and supervisory personnel that were password protected, and limited

access to certain information to those involved in preparing estimates or billing. (Catherine Glover Frazier Dep., ECF No. 50 at Ex. 14, 157:8–160:21.)

24. After John Michael left GCC and went to work for Sequoia, GCC claims that Sequoia began competing with GCC and interfered with GCC's business relationship with Dominion. GCC contends that Sequoia won bids for contracts on four projects by Dominion on which both GCC and Sequoia bid: Yorktown, Greenville, Possum Point, and Chesterfield.[4] (Denise T. Dauphin Expert Report, ECF No. 61.2, at pp. 13–15.) Sequoia's bids for those projects were lower than GCC's bids. (*Id*.)

25. GCC contends that Defendants' wrongful conduct has caused damages to GCC. (See ECF No. 74, at pp. 21–25 for a discussion of GCC's damages.)

III. PROCEDURAL BACKGROUND

26. GCC filed the Complaint in this action on February 15, 2018. (ECF No. 3.) On February 19, 2018, this case was designated to the North Carolina Business Court and assigned to the undersigned. (Designation Order, ECF No. 1; Assignment Order, ECF No. 2.)

27. In the Complaint, GCC alleges, *inter alia*, that:

    a. "[D]uring his employment and while a fiduciary of GCC, [John Michael] used his relationships with GCC employees, particularly key employees at important coal ash projects, and GCC Trade

---

[4] It is undisputed that GCC withdrew its bid on the Chesterfield project before the bids were considered and the contract awarded. There is no evidence in the record that this contract was awarded to Sequoia.

Secrets, for his personal and Sequoia's use to the detriment of GCC" (ECF No. 3, at ¶ 49);

b. John Michael has misappropriated "GCC's [b]usiness [r]elationships and [e]xpectancies and Trade Secrets for his own benefit and the benefit of Sequoia" (*Id.* at ¶ 51);

c. "John Michael, Colangelo, and Sequoia have systematically raided GCC of its employees," which "has depleted key management throughout the [c]ompany" and "severely impacted GCC's ability to service customers, to maintain GCC's hard-earned [b]usiness [r]elationships and [e]xpectancies, and has caused disclosure of GCC's Trade Secrets" (*Id.* at ¶¶ 45–46); and

d. John Michael and Mark conspired with Colangelo and Sequoia in this unlawful conduct with the "inten[t] to cause GCC to lose business and to divert that business to Sequoia." (*Id.* at ¶¶ 58–60.)

28. In the Complaint, GCC alleges claims against John Michael for: breach of fiduciary duty (First Claim); constructive fraud (Fourth Claim); and conversion (Tenth Claim). Additionally, GCC alleges a claim against Mark for breach of fiduciary duty (Second Claim), and claims against John Michael, Colangelo, and Sequoia for misappropriation and threatened misappropriation of trade secrets (Seventh Claim), and computer trespass in violation of N.C.G.S. § 14-458 (Ninth Claim). GCC alleges a claim for aiding and abetting breach of fiduciary duty against Sequoia and Colangelo (Third Claim), and an aiding and abetting constructive fraud

claim against Mark, Sequoia, and Colangelo (Fifth Claim). Lastly, GCC alleges claims against all Defendants for: tortious interference with contract and business relations (Sixth Claim); unfair methods of competition under N.C.G.S. § 75-1.1 (Eighth Claim); civil conspiracy (Eleventh Claim); and punitive damages (Twelfth Claim).

29. On September 6, 2019, GCC filed Plaintiff's Motion seeking partial summary judgment on its computer trespass claim, but only as it relates to liability and not as to damages, and on certain of Defendants' affirmative defenses: statute of limitations; equitable doctrines of waiver, estoppel, and laches; failure to mitigate damages; and unclean hands. (ECF No. 45.) GCC also submitted a brief (ECF No. 46) and evidentiary materials in support of Plaintiff's Motion (ECF Nos. 49.1–49.30, 64.1). On the same date, Defendants filed Defendants' Motion seeking summary judgment on all claims asserted against Defendants by GCC. (ECF No. 47.) Defendants also submitted a brief in support of Defendants' Motion (ECF No. 56 [SEALED], ECF No. 48) and supporting materials (ECF No. 50).

30. On October 17, 2019, GCC filed its brief in opposition to Defendants' Motion (ECF No. 71 [SEALED], ECF No. 74), and multiple materials in opposition (ECF Nos. 72.1–72.22). On the same day, Defendants filed their brief in opposition to Plaintiff's Motion (ECF No. 70 [SEALED], ECF No. 80), and multiple materials in opposition (ECF Nos. 68.1–68.10). On October 30, 2019, GCC filed its reply brief in support of Plaintiff's Motion (ECF No. 81), and multiple materials in reply (ECF Nos.

82.1–82.9).   On the same day, Defendants filed their reply brief (ECF No. 85 [SEALED], ECF No. 83), and multiple materials in reply (ECF Nos. 84.1–84.8).

31.     The Motions came before the Court for a hearing and are now ripe for decision.

IV.    ANALYSIS

### A.     Standard of Review

32.     "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c)).   The moving party bears the burden of presenting evidence which shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.   *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008).   The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense."  *Variety Wholesalers, Inc.*, 365 N.C. at 523, 723 S.E.2d at 747.   An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972).   "A 'genuine issue' is one that can be maintained by substantial evidence."  *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

33. Once the movant presents evidence in support of the motion, the nonmovant "cannot rely on the allegations or denials set forth in her pleading [ ] and must, instead, forecast sufficient evidence to show the existence of a genuine issue of material fact in order to preclude an award of summary judgment." *Steele v. Bowden*, 238 N.C. App. 566, 577, 768 S.E.2d 47, 57 (2014) (internal citation omitted). In conducting its analysis, the Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835.

34. Since both GCC and Defendants seek summary judgment in their favor on GCC's claim for computer trespass, the Court will first address the computer trespass claim. The Court will then turn to Plaintiff's Motion, and lastly will address Defendants' Motion.

## B. Computer Trespass Claim

35. GCC and Defendants both seek summary judgment in their favor on GCC's claim against John Michael, Colangelo, and Sequoia for computer trespass in violation of N.C.G.S. § 14-458. (ECF No. 3, at ¶¶ 113–22.)

36. Section 14-458 provides, in relevant part, that "it shall be unlawful for any person to use a computer or computer network without authority and with the intent to do any of the following":

> (1)    Temporarily or permanently remove, halt, or otherwise disable any computer data, computer programs, or computer software from a computer or computer network.
> (2)    Cause a computer to malfunction, regardless of how long the malfunction persists.
> (3)    Alter or erase any computer data, computer programs, or computer software.

(4) Cause physical injury to the property of another.

(5) Make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network.

. . . .

*Id.*

37. Section 14-458(a) further provides, in relevant part: "a person is 'without authority' when (i) the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission . . . ." N.C.G.S. § 14-458(a).

38. There is no dispute that John Michael made a copy of his GCC emails and the files on his GCC laptop computer and then deleted or removed the GCC emails and GCC computer files from the laptop. However, the parties dispute whether: (1) John Michael had authority to delete files; (2) GCC suffered an injury; and (3) Colangelo and Sequoia are liable for computer trespass because they conspired with John Michael. (ECF No. 46, at pp. 12–14; ECF No. 80, at pp. 13–17; ECF No. 81, at pp. 2–5; ECF No. 48, at pp. 19–20; ECF No. 74, at p. 20; ECF No. 83, at pp. 9–10.)

39. GCC argues that it is entitled to summary judgment on its computer trespass claim because although it did not have a written policy prohibiting deletion of company data, "[n]o reasonable person—much less a fiduciary—could have believed they had the authority to erase a hard drive or 21,000 emails that contained business information not stored elsewhere." (ECF No. 46, at p. 13 (emphasis in

original).)  Although John Michael subsequently returned the deleted data, GCC argues that there is sufficient evidence in the record to show that GCC suffered actual damages resulting from the deletions.  (ECF No. 81, at p. 2.)  GCC hired a third-party vendor to examine and attempt to recover data from John Michael's computer (GCC 30(b)(6) Dep., ECF No. 72.19, at 299:2–302:13; ECF No. 82.1) and incurred attorneys' fees in asking John Michael to return the documents he copied and deleted. Additionally, GCC asserts that Colangelo's text messages with John before and during the process of deleting GCC's data shows that Colangelo and Sequoia knew and conspired with John Michael to commit computer trespass.  (ECF No. 46, at pp. 13–14.)

40.    Defendants argue that there is a dispute of fact as to whether John Michael had authority when he deleted the electronic files because GCC had no policies in place related to document retention or the handling of confidential information.  (ECF No. 80, at pp. 15–16.)  Defendants also argue that they are entitled to summary judgment because GCC cannot show that it suffered an injury—"GCC has been unable to articulate any damages that it suffered as a result of the brief period of time in which it did not have access to this information or identify any materials it believes have not been returned."  (ECF No. 48, at p. 20; ECF No. 80, at p. 14.)  As to Colangelo and Sequoia's liability, Defendants assert that Colangelo and Sequoia never used or accessed GCC's computers or computer network and that GCC does not expressly allege in its Complaint that Colangelo and Sequoia conspired to commit computer trespass.  (ECF No. 80, at p. 16 (citing ECF No. 3, at ¶¶ 128–29).)

41.     The Court has thoroughly reviewed the evidence regarding the claim for computer trespass and finds that genuine disputes exist as to whether John Michael had authority to copy and delete his GCC emails and the files on his company-issued laptop and as to whether GCC suffered damages as a result of John Michael's acts. Therefore, the Court cannot grant summary judgment on the computer trespass claim against John Michael.

42.     There are no allegations of direct liability for computer trespass against Colangelo and Sequoia in the Complaint.  However, GCC alleges that Colangelo and Sequoia were "aware of and assisted or colluded" with John Michael in the deletion of GCC emails and files on his GCC computer.  (ECF No. 3, at ¶ 117.)  GCC includes many text messages and emails in the record in which John Michael discusses with Colangelo his plans to delete GCC emails and files from the GCC computer.  (ECF No. 49.12, at pp. 16–43.)  The Court concludes that there are issues of fact that preclude summary judgment on the claim that Colangelo and Sequoia conspired with John Michael to violate N.C.G.S. § 14-458.

43.     Therefore, because genuine disputes of material fact exist, to the extent the Motions seek summary judgment as to GCC's claim for computer trespass, the Motions should be DENIED.

## C.     Plaintiff's Motion

44.     GCC also seeks summary judgment as to four affirmative defenses raised by each of the four Defendants: statute of limitations (SECOND AFFIRMATIVE DEFENSE); equitable doctrines of waiver, estoppel, and laches

(THIRD AFFIRMATIVE DEFENSE); failure to mitigate damages (FOURTH AFFIRMATIVE DEFENSE); and unclean hands (FIFTH AFFIRMATIVE DEFENSE). (ECF No. 46, at p. 15.)

i. *Estoppel and Unclean Hands*

45. Defendants do not respond to Plaintiff's arguments regarding estoppel or unclean hands in their response brief, and have not directed the Court to any evidence supporting these defenses. Therefore, the Court treats Plaintiff's Motion as uncontested on these issues, and Plaintiff's Motion seeking summary judgment on Defendants' estoppel and unclean hands affirmative defenses should be GRANTED.

ii. *Statute of Limitations*

46. With the exception of Plaintiff's claim for computer trespass, which has a limitations period of one year, each of Plaintiff's claims has a limitations period of three years or more. *See* N.C.G.S. § 1-539.2A(b) (adopting a one-year statute of limitations period for computer trespass claims); *Trillium Ridge Condo. Ass'n, Inc. v. Trillium Links & Vill., LLC*, 236 N.C. App. 478, 501, 764 S.E.2d 203, 219 (2014) (three years for breach of fiduciary duty); *Toomer v. Bank Branch & Trust Co.*, 171 N.C. App. 58, 67, 614 S.E.2d 328, 335 (2005) (ten years for constructive fraud based on breach of fiduciary duty); *Glynne v. Wilson Med. Ctr.*, 236 N.C. App. 42, 48–49, 762 S.E.2d 645, 649 (2014) (three years for tortious interference with contract or prospective business relations); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 63, 620 S.E.2d 222, 232 (2005) (citing N.C.G.S. § 66-157) (three years for misappropriation of trade secrets); N.C.G.S. § 75-16.2 (four years for

unfair methods of competition); N.C.G.S. § 1-52 (three years for conversion); *Carlisle v. Keith*, 169 N.C. App. 674, 685, 614 S.E.2d 542, 549 (2005) (three years for civil conspiracy); *Tillery v. Tillery*, No. COA15-506, 2016 N.C. App. LEXIS 689, at *9 (N.C. Ct. App. July 5, 2016) (statute of limitations period for punitive damages claim tied to underlying tort claim).

47. GCC filed the Complaint on February 15, 2018. John Michael contacted Google support on March 22, 2017 regarding erasing his GCC e-mail data, which falls within the one-year time frame for computer trespass. Regarding GCC's other claims, the earliest acts giving rise to the claims occurred on April 24, 2015, when John Michael and Colangelo exchanged text messages discussing ways that John Michael could "get [his] cut" and "hide ownership" in an LLC. (ECF No. 76, at p. 1.) This occurred less than three years before GCC filed the Complaint. Additionally, Defendants acknowledge in their brief in opposition to Plaintiff's Motion that "[t]o the extent that GCC is not seeking damages that fall outside of the applicable statutes of limitation, Defendants agree that the statute of limitations defense would not apply." (ECF No. 80, at p. 17 n.6.)

48. Therefore, Plaintiff's claims are not barred by any statute of limitations period, and Plaintiff's Motion seeking summary judgment on Defendants' statute of limitations affirmative defense should be GRANTED.

*iii. Waiver*

49. "The essential elements of waiver are the existence at the time of the alleged waiver of a right, advantage or benefit, the knowledge, actual or constructive,

of the existence thereof, and an intention to relinquish such right, advantage or benefit." *Long Drive Apartments v. Parker*, 107 N.C. App. 724, 729, 421 S.E.2d 631, 633 (1992) (emphasis omitted) (citation and internal quotation marks omitted).

50.     Defendants argue that their waiver defense applies to some of the damages that GCC seeks.  (ECF No. 80, at p. 22.)  In December 2017, Dominion exercised audit provisions in its contract with GCC and, as a result, sought to have certain amounts for water treatment work that Sequoia performed credited back. Although GCC disagreed with Dominion's assessment, GCC gave Dominion a $1.3 million credit and stated that GCC could not enforce such a credit against its subcontractors.  (ECF No. 80, at p. 22; ECF No. 62.9.)  GCC now seeks to recover that amount from Sequoia.  Defendants argue that by crediting the amount in dispute back to Dominion, GCC has waived its right to seek those damages from Sequoia. (ECF No. 80, at p. 22.)

51.     The Court is unpersuaded by Defendants' argument.  There is nothing about Plaintiff's credit to Dominion that suggests it intended to relinquish all of its rights to seek damages from Sequoia.  Therefore, to the extent Plaintiff's Motion seeks summary judgment on Defendants' waiver affirmative defense, Plaintiff's Motion should be GRANTED.

   iv.     *Laches*

52.     Under North Carolina law

> [t]o establish the affirmative defense of laches, our case law recognizes that 1) the doctrine applies where a delay of time has resulted in some change in the condition of the property or in the relations of the parties; 2) the delay

necessary to constitute laches depends upon the facts and circumstances of each case; however, the mere passage of time is insufficient to support a finding of laches; 3) the delay must be shown to be unreasonable and must have worked to the disadvantage, injury or prejudice of the person seeking to invoke the doctrine of laches; and 4) the defense of laches will only work as a bar when the claimant knew of the existence of the grounds for the claim.

*MMR Holdings L.L.C. v. City of Charlotte,* 148 N.C. App. 208, 209–210, 558 S.E.2d 197, 198 (2001).

53. This case was brought only eleven months after John Michael resigned from GCC. This Court fails to understand how GCC unreasonably delayed in bringing this case, and Defendants point to no evidence that shows that this eleven-month period was unreasonable or prejudiced Defendants. Therefore, to the extent Plaintiff's Motion seeks summary judgment as to Defendants' laches affirmative defense, Plaintiff's Motion should be GRANTED.

v. *Failure to Mitigate Damages*

54. A plaintiff has a duty to mitigate its damages when it "can do so with reasonable exertion or at trifling expense; and ordinarily, [it] will be allowed to recover from the delinquent party only such damages as [it] could not, with reasonable effort, have avoided." *Biemann and Rowell Co. v. Donohoe Companies, Inc.,* 147 N.C. App. 239, 247, 556 S.E.2d 1, 6 (2001).

55. GCC argues that it tried to mitigate the harm caused by Defendants by: hiring an outside public relations firm to reassure its long-time clients; spending over $600,000 on employee retention bonuses; and hiring two recruiting firms to recruit and replace employees lost to Sequoia. (ECF No. 46, at pp. 22–23.)

56.     Defendants assert that GCC failed to mitigate its damages because GCC: made no efforts to hire qualified employees away from its competitors; did not reach out to John Michael to ask for help locating documents; and did not reallocate its employees to adequately staff existing jobs.  (ECF No. 80, at p. 18.)

57.     At this summary judgment stage, the Court cannot make the fact-intensive inquiries necessary to determine whether GCC failed to mitigate its damages.  Therefore, to the extent Plaintiff's Motion seeks summary judgment as to Defendants' affirmative defense of failure to mitigate damages, Plaintiff's Motion should be DENIED.

**D.     Defendants' Motion**

58.     Defendants seek summary judgment on all of GCC's claims brought against them.  The Court already has decided the Motions regarding GCC's computer trespass claim and will now address GCC's remaining claims.

*i.     Aiding and Abetting Claims*

59.     GCC attempts to bring causes of action for aiding and abetting breach of fiduciary duty and constructive fraud against Mark, Sequoia, and Colangelo. Defendants argue that these claims must be dismissed because North Carolina does not recognize causes of action for aiding and abetting breach of fiduciary duty.  (ECF No. 48, at p. 19); *see BDM Investments v. Lenhil, Inc.*, 826 S.E.2d 746, 763 (N.C. Ct. App. 2019) ("[T]he North Carolina Supreme Court has not recognized a cause of action for aiding and abetting breach of fiduciary duty, nor do we recognize it here.").  GCC

does not cite to any North Carolina authority recognizing a cause of action for aiding and abetting. (ECF No. 74, at p. 14.)

60. The Court concludes that, absent appellate authority recognizing a cause of action for aiding and abetting, the Defendants' Motion as to GCC's purported claims for aiding and abetting should be GRANTED.

*ii.* *Breach of Fiduciary Duty and Constructive Fraud Against John Michael*

61. GCC brings claims for breach of fiduciary duty and constructive fraud against John Michael. GCC alleges that, "[a]s GCC's current Secretary and as GCC's Director of Engineering and Construction through on or about April 3, 2017, John Michael was and is GCC's fiduciary" and that John Michael breached his fiduciary duty and took advantage of his fiduciary relationship in order to benefit himself financially. (ECF No. 3, at ¶¶ 65–66, 87.) There is no dispute that John Michael owed GCC fiduciary duties while he was an officer of GCC.

62. GCC's allegations of breach of fiduciary duty center around John Michael's involvement and ownership in Sequoia. (*Id.*) GCC alleges that John Michael breached his fiduciary duty to GCC by, among other things:

a. Founding Sequoia in September 2015 without disclosing his participation in Sequoia to GCC;

b. Usurping corporate opportunities by directing potential GCC employees to Sequoia for employment without disclosing those potential employees' availability to GCC;

c. Usurping corporate opportunities by directing potential GCC projects to Sequoia without disclosing those potential projects to GCC;

d. Entering into subcontracts with Sequoia on GCC's behalf without disclosing his participation in Sequoia's founding or his status as a founder, member or manager of Sequoia;

e. Denigrating GCC's management to Dominion and other current or potential GCC clients before resigning his position as GCC's Director of Engineering and Construction;

f. Recruiting key GCC employees to join Sequoia;

g. Misappropriating GCC's Business Relationships and Expectancies and Trade Secrets before resigning his position as GCC's Director of Engineering and Construction;

h. Actively concealing his position as a founder, manager and member of Sequoia while entering into a subcontract with Sequoia on GCC's behalf; [and]

i. Attempting to expand Sequoia's relationship with Dominion and other GCC clients while criticizing GCC and its current management to those GCC clients before resigning his position as GCC's Director of Engineering and Construction[.]

(*Id.* at ¶¶ 66, 87.)

63. In order to establish a claim for breach of fiduciary duty, plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached his or her fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to plaintiff. *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006). "To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction." *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620, 730 S.E.2d 763, 767 (2012). "Claims for breach

of fiduciary duty and constructive fraud both require proof of an injury proximately caused by the breach of duty." *BDM Investments v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at \*29–30 (N.C. Super. Ct. Mar. 20, 2014) (citation and internal quotation marks omitted); *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) ("The first issue before us is whether there was sufficient evidence, as a matter of law, that [defendant] breached a fiduciary duty owed to plaintiffs, proximately causing injury to them."); *Estate of Smith by & Through Smith v. Underwood*, 127 N.C. App. 1, 10, 487 S.E.2d 807, 813 (1997) ("The elements of a constructive fraud claim are proof of circumstances, (1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust *to the hurt of plaintiff*.") (emphasis added) (citation and internal quotation marks omitted).

64. Defendants argue that John Michael did not breach his fiduciary duties to GCC because Colangelo was, and is, the 100% owner of Sequoia, and John Michael was not, and is not, an owner of Sequoia. (ECF No. 48, at p. 15.) Additionally, Defendants argue that John Michael did not usurp any corporate opportunities from GCC by hiring Sequoia as a subcontractor prior to his resignation because GCC was unable to perform water treatment work and GCC was aware of (and approved of) Sequoia performing the water treatment work and Colangelo being associated with Sequoia. (*Id.* at pp. 16–17.) Defendants also assert that John Michael's successful attempt at obtaining a bid for GCC worth approximately $50 million close to the date

of his resignation shows that John Michael did not breach his fiduciary duties to GCC. (*Id.*)

65. As to the constructive fraud claim, Defendants argue that this claim must also fail because there is no evidence that John Michael personally benefitted from any work Sequoia performed prior to his resignation from GCC. (*Id.* at p. 18.)

66. GCC contends that John Michael is not entitled to summary judgment on either the breach of fiduciary duty or constructive fraud claim because there is a genuine dispute as to Sequoia's ownership. (ECF No. 74, at p. 11.) Furthermore, John Michael sent GCC's allegedly confidential documents and information to Colangelo with Sequoia while he was working at GCC. (*See* ECF No. 79, at pp. 3–7, 11–16, 51.)

67. The Court agrees with GCC. At a minimum, there is contradictory evidence in the record, creating a fact dispute, as to whether John Michael has any ownership interest in Sequoia. Although John Michael appears to have successfully worked to obtain a bid that benefitted GCC just a few months prior to resignation, there is also substantial evidence that John Michael sent GCC documents to Colangelo while still employed with GCC, including T&M Rates and a work plan for a job in Asheville. It is also unclear when John Michael's fiduciary duties to GCC stopped, as there is a question whether John Michael resigned as GCC's Secretary the day that he resigned as Director of Engineering and Construction. As such, the Court cannot dismiss the breach of fiduciary duty and constructive fraud claims against John Michael at this stage.

68.     Therefore, to the extent Defendants' Motion seeks summary judgment on Plaintiff's claims for breach of fiduciary duty and constructive fraud against John Michael, Defendants' Motion should be DENIED.

*iii.     Breach of Fiduciary Duty Against Mark*

69.     GCC also alleges a breach of fiduciary duty claim against Mark, stating that "Mark was and is GCC's fiduciary" in his role as GCC's Vice President of Operations. (ECF No. 3, at ¶¶ 72–73.) GCC alleges that Mark breached his fiduciary duty to GCC by, among other things:

a.   Supporting and assisting John Michael in founding Sequoia in September 2015 without disclosing to GCC John Michael's participation in founding Sequoia, or Mark's assistance to John Michael in doing so;

b.   Supporting and assisting John Michael in usurping corporate opportunities by directing potential GCC employees to Sequoia for employment without disclosing those potential employees' availability to GCC;

c.   Supporting and assisting John Michael in usurping corporate opportunities by directing potential GCC projects to Sequoia without disclosing those potential projects to GCC;

d.   Supporting and assisting John Michael in entering into subcontracts with Sequoia on GCC's behalf without disclosing John Michael's participation in Sequoia's founding or John Michael's status as a founder, member or manager of Sequoia;

e.   Supporting and assisting John Michael in denigrating GCC's management to Dominion and other current or potential GCC clients before John Michael resigned his position as GCC's Director of Engineering and Construction;

f. Recruiting key GCC employees to join Sequoia;

g. Supporting and assisting John Michael in misappropriating GCC's Business Relationships and Expectancies and Trade Secrets before John Michael resigned his position as GCC's Director of Engineering and Construction;

h. Supporting John Michael in actively concealing his position as a founder, manager and member of Sequoia while John Michael entered into a subcontract with Sequoia on GCC's behalf; [and]

i. Supporting and assisting John Michael in attempting to expand Sequoia's relationship with Dominion and other GCC clients while criticizing GCC and its current management to those GCC clients before John Michael resigned his position as GCC's Director of Engineering and Construction[.]

(*Id.* at ¶ 74.)

70. However, the only evidence that GCC identifies in support of its claim for breach of fiduciary duty against Mark are (a) text messages sent by John Michael to Colangelo claiming that John Michael discussed his plan to join Sequoia with Mark and containing statements allegedly made by Mark that he "wants to make the stand" and "just doesn't want to leave the same time as [John Michael]," and (b) Mark's statement to J.M. that he would be "surprised" at how many GCC employees John Michael and Mark could "take" if they left GCC. (ECF No. 74, at p. 12; ECF No. 49.12, at pp. 13–14; ECF No. 76, at pp. 70, 158.) Defendants argue this evidence does not create an issue of fact as to whether Mark breached his fiduciary duties to GCC. (ECF No. 48, at p. 18; ECF No. 83, at p. 4.)

71.    The Court agrees with Defendants.  The evidence that GCC relies on to show that Mark breached his fiduciary duties to GCC consists of hearsay from John Michael, and Mark's prediction that GCC employees would resign if he and John Michael left the company.  This is wholly insufficient to create an issue of material fact that Mark breached fiduciary duties to GCC.   Therefore, to the extent Defendants' Motion seeks summary judgment on Plaintiff's claim for breach of fiduciary duty against Mark, Defendants' Motion should be GRANTED.

   iv.    *Tortious Interference with Contract and Prospective Economic Advantage*

72.    GCC styles its Sixth Claim as a claim for "tortious interference with contract and business relations."   (ECF No. 3, at ¶¶ 95–99.)   GCC claims that Defendants interfered both with at-will employment contracts between GCC and its employees and interfered with its continuing relationships with Duke and Dominion, and more particularly with GCC's attempts to obtain the Yorktown, Greenville, and Possum Point projects.

   a.    <u>Tortious Interference with Contract</u>

73.    To establish a claim for tortious interference with contract, a claimant must allege:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

74.     Interference with a contract is "justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992). A defendant's actions are not justified "[i]f the defendant's *only* motive is a malicious wish to injure the plaintiff." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988) (emphasis added).

75.     The malice required to overcome a justification of business competition is legal malice, and not actual malice. *Childress v. Abeles*, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954) ("It is not necessary, however, to allege and prove actual malice in the sense of personal hatred, ill will, or spite in order to make out a case for the recovery of compensatory damages against the outsider for tortiously inducing the breach of the third person's contract with the plaintiff. The term 'malice' is used in this connection in its legal sense, and denotes the intentional doing of the harmful act without legal justification."). Legal malice "means intentionally doing a wrongful act or exceeding one's legal right or authority in order to prevent the making of a contract between two parties" and the act "must be taken with the design of injuring one of the parties to the contract or of gaining some advantage at the expense of a party." *Murphy v. McIntyre*, 69 N.C. App. 323, 328–29, 317 S.E.2d 397, 401 (1984).

76.     If an individual has a sufficient lawful reason for inducing the breach, such as in the interest of competition, he or she is exempt from liability, regardless of his or her actual malice. *Robinson, Bradshaw, & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 318, 498 S.E.2d 841, 851 (1998). "Even if plaintiff shows that defendant

acted with ill intentions, legal malice does not exist unless plaintiff can show that defendant had no legitimate business justification for the interference." *Griffin v. Holden*, 180 N.C. App. 129, 140, 636 S.E.2d 298, 306 (2006); *RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC LEXIS 46, at \*38 (N.C. Super. Ct. June 20, 2016).

77. Defendants argue that GCC "fails to show that Sequoia had no 'legitimate business interest' in hiring former GCC employees—none of whom had non-competition agreements and nearly all of whom provided GCC with weeks of advance notice that they would be leaving." (ECF No. 48, at p. 14.)

78. GCC's only response to Defendants' argument is that "[q]uestions of material fact also remain whether Defendants also tortiously interfered with GCC's at-will employment contracts." (ECF No. 74, at p. 15.) GCC does not cite to any specific evidence supporting its claim. GCC does not argue that Sequoia had no legitimate business reason for hiring GCC's employees. To the contrary, GCC claims that Sequoia was a competitor. (ECF No. 3, at ¶ 3.)

79. Plaintiff has not created a genuine issue of fact that Defendants lacked justification and did not act for legitimate business purposes in hiring GCC's employees. Therefore, to the extent Defendants' Motion seeks summary judgment in their favor on Plaintiff's claim for tortious interference with contract for interfering with GCC's at-will employment contracts with its employees, Defendants' Motion should be GRANTED.

b.     <u>Tortious Interference with Prospective Economic Advantage</u>

80.     GCC claims that after John Michael left GCC, Defendants wrongfully interfered with prospective contracts put out for bid by Dominion on the Yorktown, Greenville, and Possum Point projects. Sequoia underbid GCC on each of these projects and the projects were awarded to Sequoia.

81.     "An action for tortious interference with prospective economic advantage is based on conduct by the defendants which prevents the plaintiffs from entering into a contract with a third party." *Walker v. Sloan*, 137 N.C. App. 387, 392–93, 529 S.E.2d 236, 241 (2000) (citing *Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 680, 412 S.E.2d 636, 644 (1992)). A claim for tortious interference with prospective economic advantage requires a plaintiff to show that the defendant "interfere[d] with a business relationship 'by maliciously inducing a person not to enter into a contract with [the plaintiff], which he [or she] would have entered into but for the interference, . . . if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights.'" *Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016) (quoting *Spartan Equip. Co. v. Air Placement Equip. Co.*, 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965)). "Stating a claim for tortious interference with prospective economic advantage requires that the plaintiff allege facts [ ] show[ing] that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them[,] which contract would have ensued but for the

interference." *Cheryl Lloyd Humphrey Land Inv. Co., LLC v. Resco Prods.*, 831 S.E.2d 395, 403 (2019) (quotation marks omitted).

82. Defendants argue that they are entitled to summary judgment because GCC has not produced any evidence that "but for" Sequoia's alleged interference, GCC would have been awarded the contracts for the Yorktown, Greenville, and Possum Point projects. (ECF No. 48, at pp. 12–14; ECF No. 83, at pp. 4–6.) Additionally, Defendants assert that "Sequoia clearly had a legitimate business purpose in submitting bids for work . . . as this is the primary way business is obtained in the industry." (ECF No. 83, at p. 6.)

83. GCC argues that reasonable inferences can be drawn from the record, including John Michael's communications with Colangelo, that "Defendants maliciously induced Dominion not to contract with GCC, and that, but for this inducement, this customer would have remained with GCC for new or additional work." (ECF No. 74, at p. 15.) However, GCC offers no evidence that "but for" Sequoia's bids, GCC would have been awarded the Yorktown, Greenville, and Possum Point projects. In fact, GCC has offered no evidence regarding whether entities other than GCC and Sequoia bid on the projects, and no evidence that GCC was the next lowest bidder to Sequoia. The lack of such "but for" evidence is fatal to GCC's claim for tortious interference with prospective economic advantage. *Beverage Sys. of the Carolinas, LLC*, 368 N.C. at 701, 784 S.E.2d at 463 (In order to survive summary judgment on a claim for tortious interference with prospective economic relations, "a

plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention.").

84.    In addition, GCC's claim fails because the undisputed evidence establishes that Sequoia was a "competitor" with GCC for the type of work involved in the Yorktown, Greenville, and Possum Point projects. At the time of the bidding on the three projects, Sequoia was an established business entity performing dewatering and other work for Dominion, and had a legitimate business interest in acquiring additional work of that nature. GCC has not produced evidence that Sequoia lacked a justification for bidding on the Yorktown, Greenville, and Possum Point projects. *Hooks*, 322 N.C. at 221, 367 S.E.2d at 650 ("If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified."); *see also Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003) ("In order to demonstrate the element of acting without justification, the action must indicate no motive for interference other than malice.") (quotation marks omitted); *Griffin*, 180 N.C. App. at 140, 636 S.E.2d at 306 ("Even if plaintiff shows that defendant acted with ill intentions, legal malice does not exist unless plaintiff can show that defendant had no legitimate business justification for the interference.").

85.    Therefore, to the extent Defendants' Motion seeks summary judgment in their favor on Plaintiff's claim for tortious interference with prospective economic advantage, Defendants' Motion should be GRANTED.

*v.*     *Misappropriation of Trade Secrets*

86.     In the Complaint, GCC alleges that John Michael, Colangelo, and Sequoia misappropriated GCC's trade secrets while John Michael was still employed by GCC and used the trade secrets: "in founding Sequoia as a business"; "to poach key GCC employees"; "to begin purchasing equipment and bidding on jobs for Sequoia"; "to begin conversations with GCC clients about securing jobs for Sequoia in competition with GCC"; and "to undermine GCC's standing with GCC's long-term customers."  (ECF No. 3, at ¶ 103.)  Specifically, GCC claims that John Michael, Colangelo, and Sequoia "acquired, disclosed or used [GCC's] Trade Secrets without GCC's express or implied consent."  (*Id.* at ¶ 104.)

87.     Under the North Carolina Trade Secrets Protection Act, "misappropriation" is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1). In order to evaluate a claim for misappropriation of trade secrets, the Court must first consider whether the alleged information constitutes a trade secret. A "trade secret" is defined as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or

reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66.152(3).

88. "Trade secret protection is generally precluded for information that is widely available or generally known in the relevant industry." *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *31 (N.C. Super. Ct. Feb. 18, 2016). Public information such as client names, customer contact information, or published prices for products is usually not considered a trade secret. *See Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *26 (N.C. Super. Ct. Apr. 23, 2015). However, "in some instances, a trade secret can be found if the information or process has particular value as a compilation or manipulation of information, even if the underlying information is otherwise publicly available." *RoundPoint*, 2016 NCBC LEXIS 18, at *32. GCC asserts that it is the "'compilation of business' information" that constitutes its protectable trade secrets. (ECF No. 74, at p. 16.) Specifically, GCC alleges that the trade secrets misappropriated in this case consist of:

> the names, contacts, addresses and phone numbers of GCC's employees, customers and vendors; the equipment and project needs of GCC's customers; GCC's costs, bidding, and pricing strategies; GCC's marketing practices and materials; GCC's hiring and allocation of human resources; employee compensation; specific project billing data; equipment and personnel T&M rates; profit and loss data and other financial information; GCC's bond capacity, insurance and workers compensation coverage; company software information; and other confidential business information.

(ECF No. 3, at ¶ 16.)

89. Defendants assert that they are entitled to summary judgment for the following reasons: GCC's information is not entitled to protection as a trade secret; GCC took no reasonable steps to maintain the secrecy of the information; and Defendants did not misappropriate the information. (ECF No. 48, at pp. 10–12.) The Court will address these arguments in turn.

90. Defendants argue that the identified information does not qualify as a trade secret because: (1) certain of GCC's employees, when deposed, could not identify any trade secret; and (2) the information would not "be of any commercial value to any competitor"—"in the construction business, every job is unique, every company has its own equipment and labor rates, and every company prices a job 'the way [it] see[s] it.'" (ECF No. 48, at p. 11 (quoting Ed Martin Dep., ECF No. 50 at Ex. 7, 295:12–23).)

91. The Court is not persuaded by Defendants' arguments. First, the fact that certain company representatives of GCC could not name their "trade secrets" when asked at deposition is not dispositive. Many non-lawyers may not know the legal definition of a trade secret.

92. In addition, while customer information by itself may not constitute a trade secret, the compilation of information that GCC includes in a work plan or bid proposal could qualify. *Bldg. Ctr., Inc. v. Carter Lumber of the North, Inc.*, 2017 NCBC LEXIS 85, at *19–20 (N.C. Super. Ct. Sept. 17, 2017) ("Although customer lists, when compiled with pricing and bidding formulas, can sometimes qualify as a

trade secret under the [North Carolina Trade Secrets Protection Act], the Court does not consider a customer list containing only information that is easily accessible through a telephone book or other readily available sources to be a trade secret."); *Sunbelt Rentals, Inc.*, 174 N.C. App. at 56, 620 S.E.2d at 228 (holding "customer information (identity, contacts and requirements of its rental customers)" constituted trade secrets). At this stage, there is enough evidence to create a contested issue as to whether the information identified by GCC constitutes a trade secret.

93. Defendants also contend that GCC did not take "any steps, let alone reasonable steps, to maintain the secrecy of such information." (ECF No. 48, at p. 11.) With regard to GCC's efforts to maintain the secrecy of its trade secrets, it is undisputed that GCC does not have confidentiality agreements with employees, or any policies regarding confidential information. (Catherine Glover Frazier Dep., ECF No. 68.3, at 36:8–20, 290:10–17.) However, the computers that GCC provided to management and supervisory personnel were password protected. (Catherine Glover Frazier Dep., ECF No. 50 at Ex. 14, 157:8–160:21.) Additionally, only those involved in preparing estimates or billing had access to GCC's alleged trade secrets, such as the T&M Rates. (*Id.*) Thus, there is enough evidence to also create a disputed issue as to whether GCC took reasonable steps to maintain the secrecy of its trade secrets.

94. Finally, GCC has produced evidence that creates a disputed issue of material fact about whether John Michael, Colangelo, and Sequoia misappropriated GCC's trade secrets, including emails and text messages from John Michael to Colangelo in which he shares GCC's T&M Rates (ECF No. 79, at pp. 3–7, 11–15),

equipment rates (*Id.* at p. 51), and a GCC work plan for a construction project in Asheville (*Id.* at pp. 15–16). This is sufficient evidence of misappropriation to allow this claim to go forward.

95. Therefore, to the extent Defendants' Motion seeks judgment in their favor on GCC's claim for misappropriation of trade secrets, Defendants' Motion should be DENIED.

*vi.*      *Unfair Methods of Competition*

96. GCC alleges that Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, by, among other things:

  a. Promoting dissatisfaction and distrust of GCC and its current management among GCC's present and potential clients;

  b. Fomenting dissatisfaction and distrust of GCC and its current management among GCC's key employees and other employees;

  c. Destroying, and encouraging other GCC employees to destroy, information on GCC-owned smartphones and computers before returning those devices to the [c]ompany upon their departure, thereby concealing Defendants' unlawful and malicious acts from GCC and hampering GCC's ability to discover those acts and to seek to remedy the false and negative information concerning GCC being circulated by Defendants and by others at their direction or encouragement;

  d. Spreading rumors about GCC among GCC's clients and potential clients in an effort to create disquiet and insecurity among those clients and thus to encourage those clients not to retain GCC on their projects or to hire them for new projects;

  e. Spreading rumors about GCC among GCC's employees in an effort to create disquiet and insecurity among those

employees and thus to encourage those employees to leave their employment with GCC and to go to work with Sequoia;

f. Seeking to entice away GCC's key employees in order to damage or eliminate GCC's ability to carry on operations and adequately staff its projects so as to damage GCC's ability to compete, particularly in the key area of coal ash removal and pond development and management;

g. Acquiring and using GCC's Business Relationship and Expectancies and GCC's Trade Secrets to their advantage and to GCC's detriment; [and]

h. Surreptitiously and intentionally using GCC employees to solicit other GCC key employees while both the soliciting and the solicited employees were still employed by GCC[.]

(ECF No. 3, at ¶ 110.)

97. Section 75-1.1 declares unlawful any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." To state a claim under N.C.G.S. § 75-1.1, a plaintiff must allege that "(1) the defendants committed an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff[ ] or to the [plaintiff's] business." *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 298, 727 S.E.2d 1, 10 (2012). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and a practice is deceptive if it has the capacity or tendency to deceive." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91, 747 S.E.2d 220, 228 (2013) (quotation marks omitted); *see also Ace Chem. Corp. v. DSI Transps.*, 115 N.C. App. 237, 247, 446 S.E.2d 100, 106 (1994)

("An act or practice is deceptive if it has the capacity or tendency to deceive.") (quotation marks omitted). Unfair competition eludes a precise definition, and whether an act or practice is unfair or deceptive is ultimately a question of law for the Court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56, 714 S.E.2d 162, 167 (2011).

98. The evidence GCC relies on to support its unfair methods of competition claim mirrors the evidence it relies on in support of its misappropriation of trade secrets and breach of fiduciary duty against John Michael claims. North Carolina case law has held that breach of fiduciary duty and misappropriation of trade secrets may form the basis of an unfair methods of competition claim. *See Compton v. Kirby*, 157 N.C. App. 1, 20, 577 S.E.2d 905, 917 (2003); *Drouillard v. Keister Williams Newspaper Services, Inc.*, 108 N.C. App. 169, 172, 423 S.E.2d 324, 326 (1992). Having already determined that Defendants are not entitled to summary judgment on these claims, GCC's claim for unfair methods of competition should also be allowed to go forward.

99. Accordingly, to the extent Defendants' Motion seeks summary judgment on Plaintiff's claim for unfair methods of competition, Defendants' Motion should be DENIED.

   *vii.     Conversion*

100. GCC repackages its computer trespass claim as a claim for conversion. GCC alleges that John Michael "destroyed the contents of the [GCC-owned] laptop," "made       unauthorized      electronic      copies      of      computer      data      residing

in . . . the GCC laptop prior to his destruction of that data," and "has not returned the data he copied to GCC." (ECF No. 3, at ¶ 125.)

101. Under North Carolina law, conversion is the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (citation omitted). There are two elements in a claim for conversion: (1) the plaintiff's ownership and (2) the defendant's wrongful possession. *Id.*

102. "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner." *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008) (citation omitted). "[R]etention by a wrongdoer of an electronic copy in a manner that does not deprive the original owner of access to the same electronic data cannot constitute conversion under current North Carolina law." *Duo-Fast Carolinas, Inc. v. Scott's Hill Hardware & Supply Co.*, 2018 NCBC LEXIS 2, at *36 (N.C. Super. Ct. Jan. 2, 2018); *see also New Friendship Used Clothing Collection, LLC v. Katz*, 2017 NCBC LEXIS 72, at *38–39 (N.C. Super. Ct. Aug. 18, 2017) ("[M]erely making a copy of, as opposed to deleting, electronically stored information does not support a conversion claim because the owner is not deprived of possession or use of the information.").

103. Defendants do not dispute that John Michael deleted the data from the GCC laptop's hard drive or that he deleted his GCC email. Instead, Defendants argue that GCC was not deprived of its possession or use of the data because GCC was able to recover the emails that John Michael deleted within five days, and John Michael affirmed that, following GCC's initiation of the lawsuit, he returned to GCC all the computer files he deleted. (ECF No. 49.26; Catherine Glover Frazier Dep., ECF No. 68.3, at 291:5–292:5; John Michael Aff., ECF No. 68.2, at ¶¶ 12–16.)

104. The uncontested evidence shows that Defendants deprived GCC of access to its emails and computer files—at least temporarily. John Michael did not just make an electronic copy of his GCC emails and the data from his GCC laptop, but he deleted every email from his GCC account and all files, including the operating system, from his company-owned laptop. Whether GCC suffered any actual damages as a result of being deprived of the data is an issue for trial.

105. Therefore, to the extent Defendants' Motion seeks summary judgment in their favor on GCC's claim for conversion, Defendants' Motion should be DENIED.

*viii.* *Civil Conspiracy and Punitive Damages*

106. With regard to GCC's causes of action for civil conspiracy and punitive damages, Defendants only argue that these claims fail because the "underlying tort claims under which these claims arise fail." (ECF No. 48, at p. 21.) The Court already has concluded that GCC has produced evidence that could support claims for breach of fiduciary duty and misappropriation of trade secrets. *See* N.C.G.S. § 66-154(c) (Punitive damages can be awarded for misappropriation of trade secrets if "willful

and malicious misappropriation exists."). To the extent Defendants' Motion seeks judgment in their favor on GCC's claims for civil conspiracy and punitive damages, Defendants' Motion should be DENIED.

V. CONCLUSION

THEREFORE, IT IS ORDERED that:

1. To the extent the Motions seek summary judgment as to Plaintiff's computer trespass claim, the Motions are DENIED.

2. To the extent Plaintiff's Motion seeks summary judgment as to Defendants' affirmative defenses for estoppel, unclean hands, statute of limitations, waiver, and laches, Plaintiff's Motion is GRANTED.

3. To the extent Plaintiff's Motion seeks summary judgment as to Defendants' failure to mitigate damages affirmative defense, Plaintiff's Motion is DENIED.

4. To the extent Defendants' Motion seeks summary judgment as to Plaintiff's aiding and abetting claims, Defendants' Motion is GRANTED.

5. To the extent Defendants' Motion seeks summary judgment as to Plaintiff's claim for breach of fiduciary duty against John Michael, Defendants' Motion is DENIED.

6. To the extent Defendants' Motion seeks summary judgment as to Plaintiff's claim for breach of fiduciary duty against Mark, Defendants' Motion is GRANTED.

7.  To the extent Defendants' Motion seeks summary judgment as to Plaintiff's constructive fraud claim, Defendants' Motion is DENIED.

8.  To the extent Defendants' Motion seeks summary judgment as to Plaintiff's tortious interference with contract claim, Defendants' Motion is GRANTED.

9.  To the extent Defendants' Motion seeks summary judgment as to Plaintiff's claim for tortious interference with prospective economic advantage, Defendants' Motion is GRANTED.

10. To the extent Defendants' Motion seeks summary judgment as to Plaintiff's misappropriation of trade secrets claim, Defendants' Motion is DENIED.

11. To the extent Defendants' Motion seeks summary judgment as to Plaintiff's claim for unfair methods of competition, Defendants' Motion is DENIED.

12. To the extent Defendants' Motion seeks summary judgment as to Plaintiff's claim for conversion, Defendants' Motion is DENIED.

13. To the extent Defendants' Motion seeks summary judgment as to Plaintiff's civil conspiracy and punitive damages claims, Defendants' Motion is DENIED.

SO ORDERED, this the 18th day of June, 2020.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases